05-880 JMR/FLN

# Franchise Agreement

Between

HEALTH RECOVERY SYSTEMS, INC.

and

InnerBalance, LLC

(Name of Franchisee)

38280 WCR 19

(Street)

Fort Collins, Colorado 80524

City State Zip Code

970/495-4680

Area Code Telephone

SCANNED
MAY 04 2005
U.S. DISTRICT COURT MPLS

Exhibit A - Part 1

# Health Recovery Systems, Inc.
## Table of Contents


| ARTICLE | DESCRIPTION | PAGE |
|---|---|---|
| I | Recitals | 3 |
| II | Acknowledgements | 4 |
| III | Certain Definitions | 6 |
| IV | Grant of Franchise | 8 |
| V | Term and Successor Franchise Agreements | 9 |
| VI | Services of the Company | 11 |
| VII | Opening and Operation of the Business | 15 |
| VIII | Trademarks | 19 |
| IX | Fees | 21 |
| X | Advertising and Promotion | 21 |
| XI | Relationship of Parties/Indemnification | 23 |
| XII | Insurance | 26 |
| XIII | Reports, Financial Statements, and Audit Rights | 29 |
| XIV | Transfer of Franchise | 30 |
| XV | Right of First Refusal | 34 |
| XVI | Default & Termination | 35 |
| XVII | Obligations Upon Termination | 38 |
| XVIII | Non-Competition Covenants | 39 |
| XIX | Arbitration | 40 |
| XX | Miscellaneous | 42 |

# FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT made and entered into this 28th day of August, 2000, by and between Health Recovery Systems, Inc. (the "Company") a Minnesota corporation having its principal office at 3255 Hennepin Avenue South, Minneapolis, Minnesota 55408 and InnerBalance, LLC (the "Franchisee") having its principal office at Fort Collins, Colorado.

## ARTICLE I. RECITALS

1.1 Right to License. The Company was founded by Ms. Joan Mathews Larson and Mr. Ralph Larson. Ms. Joan Mathews Larson originally began operating the business in 1981 and incorporated it under the name Health Recovery Center, Inc. in 1981 (the "Affiliate"). Ms. Larson has developed, and the Company has the right to license, the uniform formats, systems, methods, procedures and standards (the "System") for establishing, developing and operating a business which offers an alcoholism and drug addiction treatment center utilizing a combination of biochemical repair and restoration and traditional psychological counseling as it relates to chemical addiction for patients over 15 years of age (the "Predecessor"). In addition to providing this type of biochemical treatment, the Franchisee will use natural vitamins, minerals and other natural chemical products at wholesale prices and prescriptions written by medical doctors affiliated with the Franchisee's business.

1.2 The System. The distinguishing characteristics of the System include a unique, specially developed concept which provides the services and products set forth above; a Franchisee who has been trained to provide such services and products; a specially designed method for offering and marketing such services and products by the Franchisee to the customer; operating, procurement, counseling, diagnosis, assessment, and treatment procedures; methods and techniques for financial controls, record keeping, accounting and reporting, sales and sales promotion, marketing and advertising; and the proprietary know how developed by the Company and the Affiliate, any part of which System, services and products may be further developed, improved, changed and modified by the Company from time to time.

1.3 The Business. The Franchisee will offer and perform the services described above in a diligent, competent and professional manner. The Franchisee is expected to be able to market, make sales of and enter into

contracts for such services; to counsel, analyze, diagnose, assess and treat patients who suffer from alcoholism or drug addiction and work with medical doctors and other counselors and therapists to do a treatment plan that follows the biochemical system of treatment. Invoicing to the patient will be done by the Franchisee who will collect the receivables.

1.4 The Trade/Service Marks. The Company is the licensee from the Affiliate of certain of its trademarks and service marks, and the Company has the right to license the use of the name "Health Recovery Center, Inc." and other trademarks, service marks, logos, and tradenames now or hereafter used in connection with the System (the "Marks").

1.5 Grant of Licenses. The Company grants to persons who meet the Company's qualifications, and are willing to undertake the investment and effort, a franchise to establish and operate a "Health Recovery Center, Inc." ("Health Recovery") business within a specific Territory as set forth in Exhibit B of the accompanying Uniform Franchise Offering Circular ("Offering Circular") and a non-exclusive license to use the Marks in connection therewith.

1.6 Agreement to Obtain/Grant Franchise. The Franchisee desires a franchise to establish and operate a Health Recovery business and the Company is willing to grant such a franchise on the terms and conditions hereinafter set forth.

NOW, THEREFORE, the parties, in consideration of the undertakings of each to the other, agree as follows:

## ARTICLE II.
## ACKNOWLEDGMENTS

To induce the Company to enter into this Agreement the Franchisee acknowledges, warrants and represents that:

2.1 Independent Investigation. The Franchisee has had the opportunity to conduct an independent investigation of the business opportunity offered herein and the terms and provisions of this Agreement utilizing the services of counsel, accountants and other advisors (if the Franchisee so elects). The Franchisee recognizes that the nature of the enterprise conducted by a Health Recovery business may evolve and change over time, that an investment involves business risks and that the success of the venture depends primarily upon the Franchisee's business ability and efforts.

2.2 Existing Franchisees. Prior to the execution of this Agreement, the Franchisee has had the opportunity to contact existing franchisees of the

Company, if any.

2.3 <u>No Representations Regarding Profits of the Franchise</u>. No representations have been made by the Company, the Affiliate, or by their officers, directors, shareholders, employees or agents, and relied upon by the Franchisee, as to future or past income, expenses, sales volume or potential profitability, earnings or income of the Health Recovery business franchised hereby, or of any other business of the Affiliate, other than as provided in Item 19 of the Company's Offering Circular.

2.4 <u>Reservation of Rights by the Company</u>. The Company has certain rights reserved to it to own and operate other HEALTH RECOVERY businesses, to operate other businesses offering the same services; to franchise other HEALTH RECOVERY franchisees; and, to otherwise use the System, the Marks, know how, techniques and procedures including, without limitation, those expressly set forth in Section 4.2 of this Agreement.

2.5 <u>Different Franchise Agreements</u>. Other franchisees of the Company have or will be granted franchises at different times, in different situations and under different circumstances and the provisions of such franchise agreements may vary substantially from those contained in this Agreement.

2.6 <u>Uniform Franchise Offering Circular</u>. The Franchisee has received from the Company a copy of the Company's Offering Circular, together with a copy of all proposed Exhibits and Agreements relating to the sale of the franchise at the earliest of: the first personal meeting to discuss this Franchise; or ten (10) business days prior to signing this Agreement; or at least ten (10) days prior to any payment to the Company for the sale of this franchise; and has received this Agreement containing all material terms at least five (5) days before the Franchisee has signed this Agreement.

2.7 <u>No Representation Regarding Licenses/Permits</u>. No representation has been made by the Company, or by its officers, directors, shareholders or employees or agents, or by the Affiliate, and relied upon by the Franchisee, regarding the Franchisee's ability to procure any required license or permit that may be necessary to perform any of the services contemplated to be offered by the HEALTH RECOVERY business.

2.8 <u>The Company's Rights to Sell</u>. The Franchisee affirms and agrees that the Company may sell any or all of its assets, the Marks or the System outright to a third party; may go public; may engage in a private placement of some or all of its securities; may merge, acquire other entities, or be acquired by another entity; may undertake a refinancing, recapitalization, leveraged buyout or other restructuring; and, with regard to any or all of the above transactions (which may involve an entity which is in the business of

franchising or sale of services or products similar or identical to such as provided by the Business), the Franchisee expressly and specifically waives any claims, demands or damages arising therefrom or related thereto.

2.9 The Franchisee's Advisors. The Franchisee has been advised to consult with its own advisors with respect to the legal, financial and other aspects of this Agreement, the business franchised hereby, and the prospects for that business. The Franchisee has either consulted with such advisors or has deliberately declined to do so.

2.10 Covenants Not to Compete. The covenants not to compete in this Agreement are fair and reasonable, and will not impose any undue hardship on the Franchisee, since the Franchisee has other considerable skills, experience and education which affords the opportunity to earn income from such other endeavors.

2.11 Franchisee Information. The Franchisee affirms that all information set forth in any and all applications, financial statements and submissions to the Company is true, complete and accurate in all respects, with the Franchisee being aware and expressly acknowledging that the Company is relying upon the truthfulness, completeness and accuracy of such information.

## ARTICLE III.
## CERTAIN DEFINITIONS

3.1 Business. "Business" means the operation of a HEALTH RECOVERY business solely within the Territory utilizing the System and the Marks. The Company may authorize the Franchisee to expand its operations to provide, as part of the Business and under the "HEALTH RECOVERY" or other name as the Company may prescribe, additional services as set forth in the Manual (as defined in Section 6.3).

3.2 Franchisee. "Franchisee" means each person executing this Agreement. If the Franchisee is a corporate entity, all shareholders of ten (10%) percent or more of such entity shall, concurrently with the execution of this Agreement, execute the Company's standard form guaranty pursuant to which all obligations and duties of the Franchisee are jointly and severally guaranteed by such individuals and the individual Franchisee shall remain liable for full performance. Should the Franchisee be in default, the Company may proceed directly against each such signatory, shareholder, owner and principal (the "Obligors") without first proceeding against the Franchisee and without proceeding against or naming in such suit any other Franchisee, or any of the Obligors. The obligations of the Franchisee and each such Obligor shall be joint and several.

3.3 Gross Revenues. "Gross Revenues" means the total receipts of all money or property of any kind, for or in connection with the services rendered by the Franchisee within the Territory or otherwise, directly or indirectly, in connection with the Business. The term shall be deemed to include checks, drafts, money orders, credit card payments, and all other instruments and forms of payment whether received by the Franchisee or by the Company pursuant to billings made by the Company to the Franchisee's customers, whether or not the same are postdated or are later dishonored or rescinded or payment is stopped thereon. The term shall not include applicable sales, use or service taxes nor commissions received on sales of equipment from the Company or the Affiliate.

3.4 Initial Franchise Fee. "Initial Franchise Fee" means Fifty Thousand ($50,000.00) Dollars. See Section 6.1 for potential return of Twenty Five Thousand ($25,000.00) Dollars of the Initial Franchise Fee after completion of the Initial Training.

3.5 Royalty Fee. "Royalty Fee" means ten (10%) percent of Gross Revenues for the Business payable for the immediately preceding month.

3.6 Territory. "Territory" is that area described in Exhibit "B" and any map accompanying such description within which the Franchisee receives a non-exclusive grant of license to offer its services and operate the Business. However, despite the "Territory" designation, Franchisee may market its services anywhere in the United States.

3.7 Transfer Fee. "Transfer Fee" means Twenty Five Thousand ($25,000.00) Dollars.

3.8 Computer. The Franchisee must obtain a computer and software and may be required to obtain and use a modem as specified by the Company and provide data to the Company as required by the Manual.

3.9 National Advertising Fee. "National Advertising Fee" means two percent (2%) of Gross Revenues to be payable to the Company. The Fee will be paid into the Fund.

3.10 Cooperative Advertising Fee. "Cooperative Advertising Fee" means up to three percent (3%) of Gross Revenues which the Franchisee is required to pay to the Company for cooperative advertising expenses, and which the Company will pay into a Cooperative Advertising Fund which may be established if there are two or more franchisees in a DMA.

3.11 Offering Circular. These definitions and other terms used or

defined herein have the same meaning in the Offering Circular and in the Exhibits. The Offering Circular is a "plain English" document and Health Recovery Systems, Inc., the Franchisor or the "Company" in this Agreement, is generally referred to as "we", "us", "our" or "ours" and the Franchisee as "you", "your" or "yours" in the Offering Circular.

**ARTICLE IV.**
**GRANT OF FRANCHISE**

4.1 Grant of Franchise and License. Subject to the terms and conditions herein, the Company hereby grants to the Franchisee, and the Franchisee hereby accepts from the Company, (A) a non-exclusive franchise to open and operate a Business and (B) a non-exclusive license to use the Marks, solely in connection with the operation of the Business and only within the Territory. Termination or expiration of this Agreement shall constitute a termination of the foregoing franchise and license.

4.2 Retention of Rights. Except as explicitly and specifically granted to the Franchisee herein, all rights in and to the Marks, the System, the Business and the goodwill associated with each of them is hereby reserved to the Company and to the Affiliate. Specifically, but without limitation, the Company, and the Affiliate within the Territory or without, retain the right, but shall not be obligated, to:

A. Add new services, as well as products, which are required to be provided by the Franchisee.

B. Establish, operate and franchise the System or any other programs, products and/or services under trade names, trade marks, service marks, or logos other than the Marks.

C. Sell or provide services and products licensed to be provided hereunder, utilizing the Marks, under a different distribution system than franchising. Specifically, without limitation, the Company and the Affiliate have or will enter into agreements with other parties to offer services similar or identical to those to be provided by the Franchisee and other franchisees, both in and outside the Territory.

4.3 Territorial Rights. The grant of the franchise and license described in Section 4.1 is limited to the conduct of the Business, utilizing the Marks, in the Territory. The Affiliate may also operate both within and outside the Territory. The Company may grant other franchisees and other parties the right to operate any other HEALTH RECOVERY businesses outside the Territory and, if Franchisee's sales are below $500,000 for any 12 month running period, inside the Territory.

4.4 Franchisee's Acknowledgement. Franchisee is aware and acknowledges its awareness that similar or identical services to those provided by the Business are or may be offered within or near the Territory by the Affiliate, by other HEALTH RECOVERY franchisees or by other parties under the HEALTH RECOVERY name and the Marks licensed hereunder, or within the Territory as set forth in Section 4.3.

**ARTICLE V.**
**TERM AND SUCCESSOR FRANCHISE AGREEMENTS**

5.1 Term. The term of this Agreement shall be fifteen (15) years (the "Term") commencing on the opening date of the Business. See Section 7.3.

5.2 Right to Obtain Successor Franchise Agreements. The Franchisee shall have the right to obtain one (1) additional successive franchise agreement for a term of ten (10) years (the "Successor Agreement"), provided that the following conditions have been met in each instance:

A. The Franchisee has given the Company notice between one hundred eighty (180) and two hundred seventy (270) days before the end of the Term or the term of the first Successor Agreement of its intent to obtain a Successor Agreement;

B. The Franchisee has complied with all the material terms and conditions of this Agreement and with the Company's material operating and quality standards and procedures;

C. All monetary obligations owed by the Franchisee to the Company have been satisfied prior to commencement of such Successor Agreement, and have been met, when due, throughout the Term and, if applicable, throughout the term of the first Successor Agreement;

D. The Franchisee has made, at its expense, such expenditures as determined by the Company to upgrade the computer and software to conform to the image of the System within six months after the Company has notified the Franchisee of the need to perform such;

E. The Franchisee executes the then current Franchise Agreement; the Franchisee need not pay an Initial Franchise Fee; and the Franchisee shall have in the aggregate the right to no more than two (2) Successor Agreements;

F. The Franchisee executes and delivers a general release (except as limited by law) of any and all claims it may have against the

Company, the Affiliate and its and their shareholders, officers, directors, employees, agents, representatives and affiliates.

5.3 Form and Manner of Exercising Right to Obtain a Successor Agreement. The Franchisee shall exercise its right to obtain a Successor Agreement in the following manner:

A. Between one hundred eighty (180) and two hundred seventy (270) days before the expiration of the Term, or the term of the first Successor Agreement, the Franchisee shall request from the Company a copy of its then-current Offering Circular;

B. As soon as practicable thereafter, the Company shall deliver to the Franchisee a copy of the Offering Circular. The Franchisee shall promptly acknowledge its receipt by executing and delivering to the Company the form prescribed in the Offering Circular;

C. The Franchisee shall notify the Company of its election to obtain a Successor Agreement in thirty (30) days after receipt of the Offering Circular, provided that such notice is given at least one hundred eighty (180) days prior to the end of the Term or the term of the first Successor Agreement;

D. The Company shall deliver to the Franchisee two (2) copies of the Company's then-current form of franchise agreement, promptly following receipt of the Franchisee's notice of its election to obtain a Successor Agreement. The Franchisee shall promptly execute and return both copies to the Company;

E. If the Franchisee fails to sign and deliver such franchise agreement and release in thirty (30) days after delivery of them to the Franchisee, such failure shall be deemed an election by the Franchisee not to exercise its right to obtain a Successor Agreement and such right shall lapse and expire; and

F. If the Franchisee exercises its right to obtain a Successor Agreement as described above, the Company shall execute the Franchise Agreement previously executed by the Franchisee and deliver one (1) fully executed copy to the Franchisee.

**ARTICLE VI.**
**SERVICES OF THE COMPANY**

Pre-Opening.

6.1 Initial Training.

A. The Franchisee shall attend and complete, to the Company's satisfaction, the Company's Initial Training Program ("Initial Training"). The Initial Training shall be conducted at the Company's principal offices, and/or at such other place as the Company designates, for between 2 and 6 weeks. The Initial Training covers all material aspects of the operation of the Business including, without limitation, techniques to market and sell the Franchisee's services, bid and make proposals to customers, supervise and perform counseling, analysis, diagnosis, assessment and treatment of patients who suffer from alcoholism or drug addiction and work with medical doctors and other counselors and therapist for a treatment plan including the use of the biochemical system of treatment, maintain an appropriate inventory of samples and supplies; pre-opening advertising; sales, customer service, bookkeeping, accounting and financial methods and controls, computer and software training, advertising, promotion, sales and marketing techniques, maintenance of quality standards, and other topics selected by the Company. All expenses incurred by the Franchisee in attending the Initial Training including wages, travel, room and board expenses shall be the Franchisee's responsibility. The opening of the Business can commence promptly after satisfactory completion of Initial Training. No person may be employed as a manager of the Business until completion of such Initial Training to the Company's satisfaction.

B. The Franchisee understands that it is of the essence of this Agreement that Initial Training be satisfactorily completed and the Business be open for operations within one hundred and twenty (120) days after signing this Agreement. The Franchisee expressly agrees that this Agreement may be terminated by the Company, as provided in Article XVI, if the Franchisee fails to commence operation of the Business as provided herein within such time limit and following the procedures set forth in this Article VI. If Franchisee fails to satisfactorily complete training the Company will refund $25,000 and retain $25,000 of the Initial Franchise Fee previously paid by the Franchisee to the Company in order to cover its costs and expenses of qualifying and training the Franchisee, and this Agreement thereafter will be null, void and of no effect (except for those post-termination obligations of this Agreement, which by their terms shall remain binding).

6.2 Specifications for Building, Equipment, Signs and Supplies. Before commencement of the construction at the Franchised Location, the

Company shall deliver to the Franchisee specifications for the building, equipment, Computer System, software, furnishings, decor, layout and signs relating to the Franchised Business and shall consult and advise the Franchisee with respect thereto. The Company shall provide the Franchisee with a list of all equipment, supplies and other products and services reasonably necessary for the opening and operation of the Franchised Business and with lists of approved vendors, sources of supply and standard specifications for the Premises including the signage, equipment, Computer System and inventory therefor.

6.3 Confidential Operations Manual.

A. In order to protect the reputation and goodwill of the Company, to maintain uniform standards of the services, programs, products, and operations offered and sold under the Marks, to promote the goodwill of all Businesses and for the mutual benefit of the Company and the Franchisee, the Company at the Initial Training shall lend to the Franchisee one (1) copy of the Company's Confidential Operations Manual ("the Manual").

B. The Franchisee shall conduct the operation of the Business in strict compliance with the Company's operational systems, procedures, policies, methods and requirements as prescribed in the Manual and in any supplements thereto (the "Supplements"), all of which shall be deemed a part of the Manual.

C. In addition to the requirements of Section 6.3A. and B. above, the subject matter of the Manual may include (but need not be limited to nor necessarily include all of) the following matters: requirements, duties, standards, procedures, policies, systems, techniques, guidelines and specifications pertaining to the System, to the operation of the Business and/or the products and/or services of the System; staff composition and organization systems; quality assurance programs; supervision systems; record keeping systems and materials; advertising systems and materials; purchasing procedures; proprietary nature of the manual; book-keeping and accounting materials and techniques; management and control systems; revenue reports; display of signs and notices; authorized or required equipment, computers, software, and other items; hours of operation; required uses of the Marks; insurance requirements; license requirements; required attire; required manner of offering and selling System programs and services; standards of maintenance and appearance; customer satisfaction; staff training requirements; training specifications; and, additions to, deletions from, modifications to and variation of the programs, services, and other components constituting the System, including standards and specifications relating thereto.

D. The Company retains the right to prescribe additions to, deletions from or revisions to the Manual which shall become binding on the Franchisee upon being mailed or otherwise delivered to the Franchisee, as if originally set forth therein.

E. The Manual remains the property of the Company. The Franchisee shall keep the Manual in its place of business at all times. The Franchisee, its agents, independent contractors, and employees shall at all times treat the Manual and the information contained therein as confidential, and shall use all reasonable efforts to maintain such information as confidential. The Franchisee, its agents, independent contractors, and employees shall not at any time copy, duplicate, record or otherwise reproduce the foregoing materials, in whole or in part, nor otherwise make the same available to any unauthorized person. Upon the expiration or other termination for any reason of this Agreement, the Franchisee shall return the Manual to the Company.

F. The Franchisee shall ensure that the Franchisee's copy of the Manual is current and up-to-date. In the event of any dispute as to compliance with the Manual, the terms of the master copy of the Manual maintained at the Company's principal office shall control.

6.4 Site Assistance and Approval and Pre-Opening Advertising. If the Franchised Location has not been selected and approved on the date hereof, the Company shall be available to the Franchisee, at the Franchisee's reasonable request, for advice with respect to site selection and acquisition, regulatory compliance and recommendations with respect to architects, engineers, and technical personnel. While the Company agrees to make such recommendations and give such advice in good faith based upon its prior experience, the Company makes no warranty or representation as to the skill or performance of the persons recommended by the Company. The Company shall provide the Franchisee the criteria that the Company has established for the selection of sites suitable for the location of the Franchised Business and must give it's consent to the site. The Company's consent is a permission only and is not, and does not imply, any assurance, representation or guarantee of the suitability for, or prospects of, a site for a Franchised Business.

The Company will provide an opening supply of marketing materials with printing of copies to be at the Franchisee's expense. The Franchisee may purchase all printing from Company, if it so desires. Franchisee must spend a minimum of $15,000 in advertising as the Company shall designate and provide validation copies that such advertising has been purchased.

The Company shall approve the Premises as having been completed in

accordance with the requirements and in accordance with applicable building codes. The Company must be satisfied that the Franchisee and the Franchisee's Managers have satisfactorily completed the Company's Initial Training Program.

Opening and Post Opening

6.5 Initial Assistance. At or after the Business is open, the Company shall provide at a time and for as long as prescribed by the Company, usually up to four days, a representative to facilitate the opening of the Business and assist the Franchisee in establishing procedures for the operation of the Business.

6.6 Additional Training. The Company from time to time may require that previously trained franchisees or their managers attend and successfully complete refresher training programs to be conducted at the Company's principal offices or at such other location that the Company shall designate. If a manager is required because the Franchisee is granted an additional Territory, the manager must attend additional training. Training for the Franchisee will be conducted at the expense of the Company. The Franchisee and/or the Franchisee's manager, if any, shall attend all programs or seminars at its expense, provided that such attendance outside the Territory will not be required at more than one (1) such program in any calendar year. All expenses incurred in attending such additional training or programs or seminars shall be the sole responsibility of the Franchisee.

6.7 Guidance. During the operation of the Business the Company will:

A. Conduct routine inspections, as it deems desirable;

B. Render, upon written request of the Franchisee, advisory services;

C. Provide advisory, training, referral and other services as reasonably needed.

D. Make available to the Franchisee, from time to time, all changes, improvements, and additions to the System to the same extent as made available to other franchisees of the System;

E. Provide all Supplements to the Manual;

F. Provide forms to be used by the Franchisee to report to Company all information required by the Company;

G. Provide forms and procedures for bid requests, estimating, job costing, quality control surveys, such other forms helpful in operating the Business.

H. Provide the Franchisee with a disk or other methods of Franchisee's development of customer brochures and advertising materials as well as corporate identification items (business cards, envelopes, stationery as stipulated in the Manual.

I. Make its staff available at its principal offices for consultation about problems relating to the operation of the Business, by telephone or written correspondence, and the Company shall use reasonable efforts to diligently respond to such inquiries; and

J. Send Customer Satisfaction cards and make calls to the Franchisee's customers to verify that maintenance of satisfactory levels of service is received.

6.8 Operating Assistance. The Company or its designee(s) may enter the premises of the Franchisee's customers and observe the Franchisee's operations to ensure quality of service, to review programs and their implementation, to confer with the Franchisee's employees and customers and to ascertain that the services provided, the quality of the materials, the installation, and the operations are satisfactory and meet the Company's quality and performance standards. The Franchisee will cooperate with the Company and its designees and will promptly undertake to correct any deficiencies brought to the Franchisee's attention. The Franchisee specifically authorizes the Company to situate the Company's personnel, representatives or designees at the Franchisee's or its customers' premises or observe customer calls or service, or send Customer Satisfaction cards and make calls to customers, at such times as the Company may determine to be necessary.

6.9 Advertising Assistance. The Company will, from time to time, develop advertising, promotional and marketing materials to be provided to the Franchisee but to be printed by Franchisee at the Franchisee's sole cost and expense. The Company shall have no obligation to pay the Franchisee any amount for the use of such materials in such advertising, promotion and marketing as the Franchisee may elect.

**ARTICLE VII.**
**OPENING AND OPERATION OF THE BUSINESS**

7.1 Territory. The Franchisee shall operate the Business within the Territory, but may service unsolicited accounts outside the Territory.

7.2 Opening of Business. The Franchisee shall satisfactorily complete Initial Training, obtain a computer and software; obtain all required insurance, permits and licenses and, in general, do all that is necessary for the Business to open for business no later than one hundred and twenty (120) days after signing this Agreement.

7.3 Opening for Business. The Franchisee shall not open the Business until the Company determines that the Franchisee has satisfactorily completed the Initial Training.

7.4 Maintain Standards. In order to protect the System and to maintain the uniform standards of operation under the Franchise granted herein, the Franchisee shall operate the Business at all times in strict compliance with the requirements of this Agreement and of the Manual.

7.5 Maintain Appearance. The Franchisee agrees to maintain the condition and appearance of all aspects of the Business consistent with the Company's standards for the image of the Business, including replacement of worn out or obsolete equipment, computers and software.

7.6 Approved and Disapproved Suppliers. The Franchisee must procure a computer and software from suppliers approved by the Company. The Franchisee shall have the right to purchase and contract for the procurement and supply of furniture, carpet, window treatments, wallpaper, lighting and other decor items and products as well as installers from any sources, provided that such conforms in quality to the Company's standards and specifications as provided by the Company. The Franchisee must procure nutrients from suppliers approved by the Company. The Company may disapprove any suppliers or installers in the exercise of its sole, exclusive discretion.

7.7 Compliance with Laws. The Franchisee shall, at its expense, secure and maintain in force all required approvals, licenses, and business permits, and certificates relating to the operation of the Business and shall operate the Business in strict compliance with all applicable local, state and federal laws, rules and regulations. The Franchisee agrees to refrain from any sales, advertising or promotional practice, which is unethical or may be injurious to the business of the Company, other Businesses, the System or to the goodwill associated with the Marks.

7.8 Payment of Liabilities and Taxes. The Franchisee shall pay, when due, all of its obligations, liabilities and taxes to the Company, suppliers, lessors, creditors and taxing authorities. The Franchisee's failure to comply with this provision shall be deemed a material breach of this Agreement.

7.9 Standardization. The Franchisee will comply with such programs of standardization as may from time to time be promulgated by the Company to promote the common business image and to protect the goodwill associated with the Business and the Marks.

7.10 Management. The Business shall be at all times under the direct supervision of the Franchisee or of a trained full-time Program Director who shall have successfully completed the Company's Initial Training. The use of a Program Director by the Franchisee shall not relieve the Franchisee of its obligation to participate directly in the operation and management of the Business. If the Franchisee conducts operations in more than one Territory or if the Franchisee with the Company's consent does not devote full-time to conducting the Business, at least one trained and competent employee shall act as a full-time manager. The Franchisee shall keep the Company in-formed at all times of the identity of any manager of the Business. The Company shall make training available, within certain time frames, as is reasonably necessary, for all managers designated by the Franchisee. The Franchisee shall at all times faithfully, honestly and diligently perform the obligations hereunder, use its best efforts to promote and enhance the Business, and shall not engage in any business or other activity that will conflict with the Franchisee's obligations hereunder.

7.11 Marketing. The Franchisee may only directly market (direct mail) into the Territory but may service accounts from outside the Territory if not solicited through direct mail or by other means.

7.12 Notice to the Company. The Franchisee shall notify the Company in writing within five (5) days of the commencement of any action, suit, or proceeding and the issuance of any order, writ, injunction, award or decree of any court, agency or other govern-mental instrumentality which may adversely affect the operation or financial condition of the Business.

7.13 Modifications to the System. The Franchisee understands and agrees that due to changes in competitive circumstances, presently unforeseen changes in the needs of customers, and/or presently unforeseen technological innovations, the System may need to undergo changes in order that it best serve the interests of the Company, the Franchisee and the System. Accordingly, the Franchisee expressly understands and agrees that the Company may from time to time change the components of the System, including, but not limited to, altering the products, services, methods, standards, form, policies and procedures of the System; adding to, deleting from, or modifying those products and services which the Business is authorized to offer; and, changing, improving or modifying the Marks. Subject to the other provisions of this Agreement, Franchisee expressly

agrees to abide by any such modifications, changes, additions, deletions and alterations, provided, however, that such changes do not materially and unreasonably increase the Franchisee's obligations hereunder.

7.14 <u>Confidential Information</u>. The Franchisee shall not, during the Term of this Agreement, the term of any Successor Franchise Agreement, or for a period of two (2) years thereafter, use, or divulge for the benefit of any other person(s), partnership, proprietorship, association, corporation or entity, any confidential information, knowledge or know-how concerning the systems of operation, programs, services, products, customers or practices of the Franchisee and/or of the Company and/or pertaining to the System which may be communicated to the Franchisee. Any and all knowledge, know-how, techniques and information which the Company, its affiliate(s), subsidiary(ies), designee(s) or Affiliate or the respective officers of each, designates as confidential shall be deemed confidential for the purposes of this Agreement, except information which the Franchisee can demonstrate came to the Franchisee's attention prior to the disclosure thereof by the Company or which, at or after the time of disclosure by the Company to the Franchisee, has become a part of the public domain through publication or communication by others (but in no event through any act of the Franchisee).

The Franchisee specifically understands and affirms that the following, without limitation, are deemed to constitute confidential information: procedures and processes of selling, marketing and promoting the services to customers; all other systems of operation, services, programs, products, procedures, policies, standards, techniques, specifications and criteria which now comprise or in the future may comprise a part of the System; the Manual (as same may be amended from time to time); Supplements and/or amendments to the Manual; records pertaining to customers or billings; methods of advertising and promotion; instructional materials; staff composition and organization systems; quality assurance programs; supervision systems; recommended services; record keeping systems and materials; bookkeeping systems and materials; business forms; product and service order forms; general operations materials; revenue reports; standards of biochemical treatment for alcoholism and drug addiction and the treatment thereof; activity schedules; job descriptions; advertising, promotional and public relations materials/campaigns/guidelines/philosophy; specifications, systems, standards, techniques, philosophies and materials, guidelines, policies and procedures concerning the System; additions to, deletions from, and modifications and variations of the components constituting the System or the systems and methods of operations which are now, or may in the future, be employed by the Company, including all standards and specifications relating thereto and the means and manner of offering and selling same; and, all other components, specifications,

standards, requirements and duties imposed by the Company, or any affiliate, subsidiary or designee.

The Franchisee shall not at any time copy, duplicate, record or otherwise reproduce any of the foregoing confidential information or material, in whole or in part, or otherwise make same available to any third party except as authorized herein. Upon the expiration or other termination of this Agreement or the term of any Successor Agreement, the Franchisee shall return to the Company all such confidential information including all materials, books, records, software and manuals deemed to be confidential herein which are in the Franchisee's possession.

The Franchisee and any manager who is required to successfully complete the Initial Training shall divulge only such confidential information as may be necessary, and then only to such of the Franchisee's employees, agents or independent contractors as must have access to it in order to conduct the operation of the Business. The Franchisee shall take precautions to ensure that such employees and other parties retain such information in confidence, and take whatever steps are necessary to accomplish the foregoing.

## ARTICLE VIII.
## TRADEMARKS

8.1 Ownership. The Franchisee acknowledges the validity of the Marks and that they are the sole property of the Company and of the Affiliate. The Franchisee's right to use the Marks is derived solely from this Agreement and is limited to the conduct of the Business by the Franchisee pursuant to and in compliance with this Agreement and all applicable standards, specifications and operating procedures prescribed by the Company from time to time. Any unauthorized use of the Marks by the Franchisee is a breach of this Agreement and an infringement of the rights of the Company. All usage of the Marks by the Franchisee and any goodwill established by the Franchisee's use of the Marks shall inure to the exclusive benefit of the Company and of the Affiliate. All provisions of this Agreement applicable to the Marks apply to any additional trademarks, service marks, and commercial symbols hereafter authorized for use by and licensed to the Franchisee.

8.2 Use. The Franchisee shall use the Marks only as authorized, directed or approved by the Company. The Franchisee shall not use the Marks as part of any corporate or trade name, or within any prefix, suffix, or other modifying words, terms, designs, or symbols, or in any modified form, nor may the Franchisee use the Marks in connection with the sale of any unauthorized product or service or in any other manner not expressly

authorized by the Company. The Franchisee shall give such notice of trademark and service mark registration as the Company specifies and obtain such fictitious or assumed name registrations as may be required under applicable law. The non-exclusive personal right of the Franchisee to use the Marks in connection with the Business and its right to use the Marks and the System apply only in the Territory and only so long as the Franchisee shall fully perform and comply with all of the conditions, terms and covenants of this Agreement and the Manual. If, in the judgment of the Company, the acts of the Franchisee infringe upon or demean the goodwill, standards of uniformity or quality, or business standing associated with the Marks and the System, then the Franchisee shall immediately, upon notice from the Company, modify its use of the Marks and the System in the manner prescribed by the Company. The Franchisee shall not, during or after the Term of this Agreement or the term of any Successor Agreement, do anything directly or indirectly which would infringe upon, harm, mislead or contest the rights of the Company and of the Affiliate in the Marks or the System.

8.3 Infringement. The Franchisee shall immediately notify the Company in writing of any apparent infringement of or challenge to the Franchisee's use of the Marks and of any claim by any person of any rights in the Marks or in any similar trade name, trademark, service mark or logo of which the Franchisee becomes aware. The Franchisee shall not directly or indirectly communicate with any person other than the Company and its counsel in connection with any such infringement, challenge or claim. The Company shall have sole discretion and exclusive right to take such action as it deems appropriate to control any litigation, U.S. Patent and Trademark Office proceeding or other administrative proceeding arising out of such infringement, challenge or claim or otherwise relating to the Marks. The Franchisee shall execute any and all instruments and documents, render such assistance, and do such acts and things as may, in the opinion of the Company's counsel, be necessary or advisable to protect and maintain the interests of the Company in any such litigation, or administrative proceedings, or to otherwise protect and maintain the interest of the Company in the Marks.

8.4 Indemnification. The Company shall defend and indemnify the Franchisee against and reimburse the Franchisee for all damages for which it is held liable in any legal proceeding brought against the Franchisee arising out of the Franchisee's authorized use of any of the Marks pursuant to this Agreement, provided, that the Franchisee shall have timely notified the Company of such claim or proceeding and has otherwise complied with this Agreement and, provided further, that the Company shall have had the right to adequately defend any such claim.

8.5 Substitutions. If there is a claim by any third party that its right to any use of the Marks is superior, or if there is any claim by a governmental entity that use of any of the Marks is objectionable or is prohibited, and if the Company determines that such claim is legally meritorious or if the Company determines, in its sole discretion, that it is advisable for the Company and/or the Franchisee to modify or discontinue the use of any of the Marks, and/or use one or more additional or substitute Marks, then upon notice from the Company the Franchisee, at its expense, will immediately make such changes and amendments to the Marks as may be required by the Company. In no event shall the Company have any liability to the Franchisee for consequential or other damages because of such modification or discontinuance of any of the Marks and the need to substitute other marks for the modified or discontinued Marks.

## ARTICLE IX.
## FEES

9.1 Initial Franchise Fee. The Franchisee shall pay to the Company the Initial Franchise Fee upon the execution of this Agreement. The Initial Franchise Fee shall be non-refundable and deemed fully earned by the Company when paid, except as otherwise expressly stated to the contrary in this Agreement.

9.2 Royalty and Other Fees. In addition to the Initial Franchise Fee, the Franchisee will pay to the Company, without offset, credit, or deduction of any kind, the Royalty Fee, the National Advertising and Cooperative Advertising Fees and any other payments due to the Company from the Franchisee in a timely manner.

9.3 Payment. On or before the 10th of each month, the Franchisee shall submit to the Company on a form prescribed by the Company, a correct statement, signed by the Franchisee, of the Franchisee's Gross Revenues for the previous month. Notwithstanding any designation by the Franchisee, the Company shall have the discretion to apply any payments from customers of the Franchisee to any past due indebtedness of the Franchisee.

9.4 Late Fee. If payment under 9.2 or 9.3 is not received by the 15th of the month, a late fee of ten percent (10%) of the fees payable will be charged to the Franchisee.

## ARTICLE X.
## ADVERTISING AND PROMOTION

10.1 Marketing and Brochures. The Company will, at its expense, and

as provided in Section 6.9 and the Manual, furnish marketing and promotional materials to the Franchisee. The Franchisee will pay for Yellow Pages advertising, as specified in the Manual.

10.2 Marketing Programs. Franchisee agrees to implement any promotional programs or services developed and offered by the Company from time to time.

10.3 National Advertising Fee and Fund. The Company has elected to establish a National Advertising Fund, and will collect from the Franchisee such Fee to be paid into such Fund to be administered by the Company for the benefit of all franchisee and Company businesses. The Company will pay an equal amount into the Fund from its Gross Revenues with respect to its own Company outlets.

Administration of such fee shall be as follows: ten percent (10%) for Company administration with the balance directly to media costs.

10.4 Local Advertising Requirement. The Franchisee is required to expend three (3%) of its monthly Gross Revenues in its immediate market area and to provide tear sheets and other proof of such expenditures to the Company upon request.

10.5 Cooperative Advertising Fee and Fund. If and when there are two or more franchisees in a DMA* the Company may elect to establish a Cooperative Advertising Group. The Franchisee will pay the Company up to three percent (3%) of its Gross Revenues and the Company will contribute up to three percent (3%) of Gross Revenues to the Cooperative Advertising Fund. The Franchisees then need not make expenditures for the Local Advertising Requirement up to the % paid as such Fee. The Company may hire an advertising agency to handle the expenditures of the Cooperative Advertising Fund. Such Fund will purchase from the Company and, with the Company's approval, may develop advertising and promotional materials; engage in joint and cooperative advertising and promotional programs; purchase combined Yellow Page advertising; buy media time; collect cooperative contributions from Suppliers and contribute such to the Fund; and engage in other and similar programs on a Dominant Marketing Area ("DMA") basis. The Company may form and chair, change or dissolve an advertising council composed of franchisees in the DMA, and cast tie-breaking votes, if needed. The Company may choose to use part of Fund contributions to cover Company contribution costs to the Fund. Such Fund will be administered by the Company, at the cost of the Company, and an unaudited accounting will be rendered to franchisee and Company store participants annually.

Direct Marketing Advertising

## ARTICLE XI.
## RELATIONSHIP OF PARTIES/INDEMNIFICATION

11.1 Relationship of the Parties. This Agreement does not create a fiduciary relationship between the parties. The Franchisee understands and agrees that, under this Agreement, the Franchisee is and shall be an independent contractor of the Company. Nothing in this Agreement is intended to make either party a general or special agent, joint venturer, partner or employee of the other for any purpose.

The Franchisee shall conspicuously identify itself and the Business, and in all dealings with customers, suppliers, public officials, and others, as an independent franchisee of the Company, and shall place such notice of independent ownership on all forms, business cards, stationery, advertising, signs and other materials and in such fashion as the Company, in its sole and exclusive discretion, specifies and requires from time to time in the Manual.

11.2 No Liability for Act of the Other. Except as otherwise expressly authorized by this Agreement, neither party hereto will make any express or implied agreements, warranties, guarantees or representations or incur any debt in the name of or on behalf of the other party, or represent that the relationship between the Company and the Franchisee is other than that of Franchisor and Franchisee. The Company does not assume any liability, and will not be deemed liable for any agreements, representations, or warranties made to or by the Franchisee which are not expressly authorized under this Agreement, nor will the Company be obligated for any damages to any person or property which directly or indirectly arise from or relate to the operation of the Business. The Company shall not have the power to hire or fire the Franchisee's employees and, except as herein expressly provided, the Company may not control or have access to the Franchisee's funds or the expenditure thereof, or in any other way exercise dominion or control over the Business. The Company shall not be obligated for any damages to any person or party, directly or indirectly, arising out of the operation of the Business whether caused by the Franchisee's negligent or willful action or failure to act. It is expressly understood and agreed that neither the Franchisee nor any employee or independent contractor of the Franchisee whose compensation for services is paid directly or indirectly by the Franchisee may, in any way, directly or indirectly, expressly or by implication, be construed to be an employee of the Company for any purpose, most particularly with respect to any mandated or other insurance coverage, tax or contributions, or requirements pertaining to withholdings, levied or fixed by any state, local or federal governmental agency. The Company shall have no liability for any sales, use, occupation, excise, gross receipts, income, property or other taxes, whether levied upon the Franchisee, the Business, or the Franchisee's property, or upon the Company, in connection with sales

made or business conducted by the Franchisee or payments to the Company pursuant hereto.

11.3 Indemnification. The Franchisee agrees at all times to defend at the Franchisee's own cost, and to indemnify and hold harmless to the fullest extent permitted by law, the Company, the Affiliate and corporate subsidiaries, affiliates, successors, assigns and designees, and their respective directors, officers, employees, agents, shareholders, designees, and representatives (the Company and all other hereinafter referred to collectively as "Indemnitees") from all losses and expenses (as hereinafter defined) incurred in connection with any action, suit, proceeding, claim, demand, investigation, or formal or informal inquiry (regardless of whether same is reduced to judgment) or any settlement thereof which arises out of or is based upon any of the following: the Franchisee's alleged infringement or any other violation or any other alleged violation of any patent, or copyright or other proprietary right owned or controlled by third parties; the Franchisee's alleged violation or breach of any contract, federal, state or local law, regulation, ruling, standard or directive or of any industry standard; libel, slander or any other form of defamation by the Franchisee; the Franchisee's alleged violation or breach of any warranty, representation, agreement or obligation in this Agreement; any acts, errors, or omissions of the Franchisee or any of its agents, servants, employees, contractors, partners, proprietors, affiliates or representatives; the inaccuracy, lack of authenticity or nondisclosure of any information by any customer of the Business; any service provided by the Franchisee at, from or related to the operation at the Business; any services or goods provided by any affiliated or nonaffiliated participating entity; any action by any customer of the Business; and, any damage to the property of the Franchisee or the Company, their agents or employees, or any third person, firm or corporation, unless such losses, claims, costs, expenses, damages, or liabilities were caused wholly or in part through the active or passive negligence of the Company or any of its agents or employees, or resulted from any strict liability imposed on the Company or any of its agents or employees.

For the purpose of this Section 11.3, the term "losses and expenses" shall be deemed to include, without limitation, all losses, compensatory, exemplary or punitive damages, fines, charges, costs, expenses, lost profits, attorneys' fees, experts' fees, court costs, settlement amounts, judgments, compensation for damages to the Company's or the Affiliate's reputation and goodwill, costs of or resulting from delays, financing, costs of advertising material and media time/space, and costs of changing, substituting or replacing same, and any and all expenses of recall, refunds, compensation, public notices and other such amounts incurred in connection with the matters described.

The Franchisee agrees to give the Company notice of any such action, suit, proceeding, claim, inquiry or investigation. At the expense and risk of the Franchisee, the Company may elect to assume (but under no circumstance is obligated to undertake) the defense and/or settlement of any such action, suit, proceeding, claim, demand, inquiry or investigation, provided that the Company will seek the advice and counsel of the Franchisee, and shall keep the Franchisee informed, with regard to any such proposed or contemplated settlement(s). Such an undertaking by the Company shall in no manner or form diminish the Franchisee's obligation to indemnify the Company and to hold it harmless.

In order to protect persons or property, or its reputation or goodwill, or the reputation or goodwill of others, the Company may, at any time and without notice as it in its judgment deems appropriate, offer, order, consent or agree to settlements or take such other remedial or corrective actions as it deems expedient with respect to the action, suit, proceeding, claim, demand, inquiry or investigation if, in the Company's sole judgment, there are reasonable grounds to believe that:

A. Any of the acts or circumstances enumerated in this Section 11.3 have occurred; or

B. Any act, error, or omission of the Franchisee may result directly or indirectly in damage, injury or harm to any person or any property.

All losses and expenses incurred under this Section 11.3 shall be chargeable to and paid by the Franchisee pursuant to its obligations of indemnity regardless of any actions, activity or defense undertaken by the Company or the subsequent success or failure of such actions, activity or defense.

The Indemnitees do not assume any liability whatsoever for acts, errors, or omissions of those with whom the Franchisee may contract, regardless of the purpose. The Franchisee shall hold harmless and indemnify the Indemnitees for all losses and expenses, which may arise out of any acts, errors or omissions of these third parties.

Under no circumstances shall the Indemnitees be required or obligated to seek recovery from third parties or otherwise mitigate their losses in order to maintain a claim against the Franchisee. The Franchisee agrees that the failure to pursue such recovery or mitigate loss will in no way reduce the amounts recoverable by the Indemnitees from the Franchisee.

The Company agrees to indemnify the Franchisee against and to