Exhibit A - Part 2

reimburse the Franchisee (except as otherwise expressly disclaimed in this Agreement) for any obligations or liability for damages attributable to false representations, or breach of warranties of the Company, or caused by the negligence or willful action of the Company, or as a result of trademark infringement proceedings as set forth in Section 8.4, and for costs reasonably incurred by the Franchisee in the defense of any such claim or any action arising therefrom in which it is named as party, provided that the Company shall have the right to participate in and, to the extent the Company deems necessary, to control any such litigation or proceeding.

The indemnities and assumptions of liabilities and obligations set forth in this Agreement shall continue in full force and effect subsequent to, and notwithstanding the expiration or termination of, this Agreement.

## ARTICLE XII.
## INSURANCE

12.1 Required Insurance. To standardize insurance and to afford the Franchisee and the Company and other Indemnities protection against insurable risks, the Company requires minimum standards, limits, and certain types of insurance coverage to be purchased by the Franchisee. Such standards and limits may be established through the Manual or by other written notice.

A. The Franchisee shall purchase at its sole expense, and maintain in effect at all times during the term of this Agreement and any successor Agreements, the following categories of insurance coverage through licensed and admitted insurance companies acceptable to the Company:

(1) Broad form comprehensive general liability coverage, and broad form products liability and contractual liability coverages in an amount and form and with a carrier or carriers satisfactory to the Company; but in no event, in an amount less than Three Million ($3,000,000) Dollars aggregate; nor shall such insurance have a deductible or self-insured retention in excess of Five Thousand ($5,000) Dollars for which amount the Franchisee is liable;

(2) Worker's Compensation and Employer's Liability Insurance for the Franchisee's Business employees (in statutory amounts);

(3) Unemployment Insurance for the Franchisee's Business employees;



SCANNED
MAY 04 2005
U.S. DISTRICT COURT MPLS

(4) Fire and Extended Coverage Insurance in an amount adequate to replace owned or leased products in the event of an insured loss;

(5) Automobile liability insurance including owned, hired and non-owned vehicle coverage, with a combined single limit of at least Three Million ($3,000,000) Dollars;

(6) Errors and omissions insurance.

B. The insurance coverage acquired and maintained by the Franchisee at its expense, as set forth in subsection (A) shall:

(1) be acceptable to the Company;

(2) contain no provision which in any way limits or reduces coverage for the Franchisee in the event of a claim by any one (1) or more of the Indemnitees;

(3) extend to and provide indemnity for all obligations assumed by the Franchisee hereunder and all other items for which the Franchisee is required to indemnify the Company under the provisions of this Agreement;

(4) be primary to and without right of contribution from any other insurance purchased by the Indemnitees;

(5) be written on an occurrence basis; and

(6) provide, by endorsement, that the Company is entitled to receive at least thirty (30) days prior written notice of any intent to reduce policy limits, restrict coverage, cancel or otherwise alter or amend said policy.

The Franchisee shall not reduce the policy limits, restrict coverage, cancel or otherwise alter or amend said insurance policies without the Company's prior written consent.

In the event of a claim by any one (1) or more of the Indemnitees against the Franchisee, the Franchisee shall, on request of the Company, assign to the Company any and all rights which the Franchisee then has or thereafter may have with respect to such claim against the insurer(s) providing coverages described in Section 12.1.

12.2 <u>The Company's Right to Purchase</u>. If the Franchisee fails to

purchase insurance conforming to the standards and limits prescribed by the Company, the Company may (but is not required to) obtain, through agents and insurance companies of its choosing, such insurance as is necessary to meet such standards on behalf of the Franchisee. Payments for such insurance shall be borne by the Franchisee and the Franchisee expressly agrees to forthwith pay the required premiums or to reimburse the Company therefor. Nothing contained herein shall be construed or deemed to impose any duty or obligation upon the Company to obtain or maintain any specific forms, kinds or amounts of insurance for or on behalf of the Franchisee.

12.3 Disclaimer. Nothing contained herein shall be construed or considered an undertaking or representation by the Company that such insurance and bonding as may be required to be obtained by the Franchisee, or by the Company for the Franchisee, will insure the Franchisee against any or all insurable risks of loss which may or can arise out of or in connection with the operation of the Business.

12.4 Additional Insureds. Except for the insurance coverages provided in Section 12.1 A (2) and (3) above, all insurance purchased by the Franchisee (or by the Company for the Franchisee) shall name the Company and the Indemnitees identified in Section 11.3 of this Agreement as additional insureds for the Term hereof and the Term of any Successor Franchise Agreement, and shall provide that the Company shall be given at least thirty (30) days prior written notice of any termination, amendment, cancellation or modification thereof. The Franchisee shall promptly provide the Company with Certificates of Insurance evidencing such coverage no later than ten (10) days prior to the date that the Business will commence operations. All insurance policies and documents shall be renewed, and upon such renewal, a renewal Certificate of Insurance shall be furnished to the Company prior to the expiration date of the existing term(s) of the policy(ies) in question. The Company may at any time require the Franchisee to forward to the Company full copies of all or any insurance policies.

12.5 Notice of Claims. The Franchisee shall notify the Company of any and all claims or demands against the Franchisee, the Business and/or the Company within three (3) days of the Franchisee receiving actual notice of any such claim or demand. The Franchisee agrees to respond to all claims within the time required by law, rule or regulation. The Franchisee shall cooperate with the Company (or its designee) in every fashion possible to defend the Company and the Franchisee against any and all claims made by employees, customers or third parties. The Franchisee shall, when necessary, make appearances at administrative or other hearings to present or reinforce such defenses.

12.6 Failure to Insure - Right to Terminate. Failure by the Franchisee to purchase or maintain any insurance required by this Agreement, or failure to reimburse the Company for its purchase of such insurance on behalf of the Franchisee, shall constitute a material and incurable breach of this Agreement which, unless waived by the Company, shall entitle the Company to terminate this Agreement unilaterally and immediately upon notice to the Franchisee, and this Agreement shall thereafter be null, void and of no effect (except for those post-termination and post-expiration provisions which by their nature shall survive).

12.7 Minimum Coverages. The minimum limits of insurance coverage required to be procured by the Franchisee may be modified from time to time by the Company, in its sole and exclusive discretion, by written notice transmitted by the Company to the Franchisee. Upon delivery (or attempted delivery) of such written notice, the Franchisee shall be obligated to immediately purchase insurance conforming to the newly-established standards and limits prescribed by the Company.

## ARTICLE XIII.
## REPORTS, FINANCIAL STATEMENTS AND AUDIT RIGHTS

13.1 Books and Records. The Franchisee shall establish and maintain at the Franchisee's expense a bookkeeping, accounting and record keeping system conforming to the requirements prescribed by the Company from time to time. With respect to the operation and financial condition of the Business, the Franchisee shall sign, verify and furnish the following reports, financial statements and returns to the Company in the form prescribed by the Company.

A. On or before the 10th of each month, a report of the Gross Revenues of the Business for the preceding month and such other data, information and supporting records as the Company shall require as set forth in the Manual;

B. Within thirty (30) days after the end of each quarter, a profit and loss statement;

C. Within sixty (60) days after the end of the fiscal year a profit and loss statement, balance sheet and cash flow statement for the fiscal year reflecting all year-end adjustments.

13.2 Records of Gross Revenues - Computer. The Franchisee shall record Gross Revenues with a computer and software which has been approved or specified by the Company. The Company may require a modem to be attached to the computer system and Franchisee agrees to allow

Company access to any data on such computer system.

13.3 Audit of Books and Records. All records shall be kept for a period of at least four (4) years following the end of each fiscal year. The Company may, from time to time, cause one or more complete audits to be made of the affairs and records relating to the operations of the Business. Upon request by the Company, the Franchisee shall make such books, records and information available to the Company or its designated representative at a reasonable time and place for review and audit by the Company. If such audit results in a determination that the Royalty Fee is deficient (underpaid) by more than three percent (3%), the Franchisee shall promptly pay to the Company an amount equal to three (3) times the defined Royalty Fee and other indebtedness shown to be due, plus interest at the highest legal rate not to exceed 1½% per month on the deficiency and all costs and expenses incurred by the Company in conducting such audit, including salaries of the Company's representatives, travel costs, room and board and audit fees. If the deficiency is less than three (3%) percent, the Franchisee shall promptly pay the actual deficiency and interest at the highest legal rate not to exceed 1½% per month on the deficiency. Nothing contained herein shall constitute an agreement by the Company to accept any payments after the same are due or commitment by the Company to extend credit to or otherwise finance the Franchisee's operation of the Business.

## ARTICLE XIV.
## TRANSFER OF FRANCHISE

14.1 Assignment by the Company. The Company shall have the right to assign this Agreement provided that: (i) the assignee, at the time of such assignment, is financially responsible and economically capable of performing the obligations of the Company hereunder; and (ii) the assignee assumes and agrees to perform such obligations.

Specifically, and without limitation to the foregoing, the Franchisee expressly affirms and agrees that the Company, its Affiliate and its and their shareholders may sell its assets, its Marks, or its System outright to a third party; may go public; may engage in a private placement of some or all of its securities; may merge, acquire other corporations, or be acquired by another corporation; may undertake a refinancing, recapitalization, leveraged buyout or other economic or financial restructuring; and, with regard to any or all of the above sales, assignments and dispositions, the Franchisee expressly and specifically waives any claims, demands or damages arising from or related to the loss of association with or identification of the Company as franchisor hereunder. See also the Company's Rights To Sell pursuant to Section 2.8

above.

Nothing contained in this Agreement shall require the Company to remain in the business franchised hereby or to offer services franchised hereunder, whether or not bearing the Marks, to the Franchisee in the event that the Company exercises its rights hereunder to assign its rights in this Agreement.

14.2 Transfer to Corporation by the Franchisee.

A. Subject to the Company's prior written consent, the Franchisee, if a natural person, may transfer its rights hereunder to a corporation without, however, being relieved of any personal liability. The Company will not unreasonably withhold such consent provided the following conditions are met:

(1) The corporation is newly organized and its activities are confined to the Business;

(2) The Franchisee owns the controlling stock interest and is the chief executive officer;

(3) The Company is advised of relevant information with respect to all shareholders of the corporation;

(4) All money and other obligations of the Franchisee to the Company are fully paid and performed;

(5) The corporation agrees, in form satisfactory to the Company, to assume all the Franchisee's obligations;

(6) All shareholders of the corporation guarantee, in form satisfactory to the Company, the full and prompt payment and performance of all obligations to the Company;

(7) Each stock certificate of the corporation shall have conspicuously endorsed upon it a statement that it is held, and that assignment thereof is, subject to all restrictions imposed upon assignments by this Agreement; and

(8) No new share of stock in the corporation shall be issued without obtaining the Company's prior written consent and then only upon disclosure of the terms and conditions contained herein being made to the new holders of the stock.

B. No transfer, as defined below, of the stock shall be made without the prior written consent of the Company except that there may be a transfer of all the corporation's stock on the same terms as those on which a transfer of the Franchisee's franchise or the Business would be permitted hereunder. These restrictions shall be conspicuously noted on all stock certificates and all transferee shareholders shall be required to guarantee, in form satisfactory to the Company, the full and prompt payment and performance by the Franchisee of all obligations to the Company.

14.3 Transfer by the Franchisee. Subject to the Company's prior written consent, which will not be unreasonably withheld, the Franchisee may sell, transfer, lease or assign its interest in this Agreement or the Business, or may by merger, consolidation, stock exchange or in similar fashion effect such by operation of law ("Transfer"), provided the following conditions are met:

A. The purchaser, transferee, lessee, assignee or entity effecting such by operation of law as set forth immediately above ("Assignee") (or the principal officers, shareholders or directors of the Assignee in the case of a corporate Assignee) has the aptitude, skills, qualifications, credit and financial resources necessary, in the Company's judgment, to conduct the Business and to fulfill the Assignee's obligations to the Company;

B. As of the date of any such Transfer, the Franchisee shall have fully complied with all its obligations hereunder or under any other agreement with the Company or the Affiliate, including, without limitation, all monetary obligations;

C. Assignee assumes all of the obligations of the Franchisee, and that there is no default;

D. Assignee executes the Company's then-current form of Franchise Agreement (except that Assignee shall not be obligated to pay an Initial Franchise Fee) the term of which shall expire on the date of expiration of this Agreement. If the Franchisee shall have obtained the first Successor Agreement at the time of the Transfer, the Franchise Agreement executed by the Assignee shall contain the right to obtain one Successor Agreement. If the Franchisee shall have obtained the second Successor Agreement at the time of the Transfer, the Franchise Agreement executed by the Assignee shall not contain the right to obtain any further Successor Agreements. The execution of the new Franchise Agreement shall, except for post-term obligations of the Franchisee, terminate this Agreement;

E. The Franchisee executes and delivers to the Company a general release, except as limited by law, of all claims against the Company, the

Affiliate and its and their shareholders, officers, directors, employees, and agents;

F. Assignee shall have satisfactorily completed the Initial Training then required of all new franchisees unless such training is waived by reason of the Assignee's prior experience or training, and shall have paid the then-current training fee;

G. The Franchisee provides such information as the Company requires to evaluate the proposed Assignee;

H. The Franchisee has first given the Transfer Notice and complied with Article XV;

I. Any advertisement for a Transfer shall make clear that the Franchisee and not the Company is the offeror;

J. The Franchisee pays the Transfer Fee to reimburse the Company's expenses to investigate such Transfer; and

K. The Franchisee agrees to remain liable for full performance of this Agreement for 12 months after the Transfer.

14.4 Controlling Interest. The aggregate transfer of more than 10% of the capital stock or voting power of any corporate franchisee or of more than 10% interest in a general partnership franchise, is a Transfer.

14.5 Death or Incapacity of the Franchisee. The transfer of the Franchisee's interest in this Agreement and in the Business to the Franchisee's heirs, personal representatives or conservators, as applicable, in the event of death or legal incapacity of the Franchisee, shall not constitute a Transfer nor give rise to the Company's right of first refusal, provided that the heirs, personal representatives or conservators, as applicable, meet the Company's standards for new Franchisees; execute the then-current form of Franchise Agreement; and, that a manager has, or within three (3) months shall have enrolled in and begun the Initial Training at the Company's then standard fee and charge and has satisfactorily completed the Initial Training within such three months.

14.6 Subfranchising. The Franchisee may not subfranchise or otherwise attempt to sell, transfer or assign a portion, but not all, of its rights under or pursuant to this Agreement.

14.7 Compliance with Disclosure Laws. The Franchisee shall give the Company 30 days prior notice of any Transfer.

14.8 No Encumbrance. The Franchisee may not pledge, encumber, or otherwise give a security interest in its rights under this Agreement without the prior written consent of the Company, which consent may be withheld for any reason whatsoever in the Company's sole, subjective judgment.

## ARTICLE XV.
## RIGHT OF FIRST REFUSAL

15.1 Right of First Refusal and Transfer. Prior to any Transfer under Section 14.3, the Franchisee shall deliver to the Company written notice (the "Transfer Notice"), setting forth all of the terms and conditions of the proposed Transfer, including all documents of sale, transfer, assignment, merger, or acquisition and all available information of the proposed Assignee.

15.2 Right of First Refusal. Within fifteen (15) days after the Company's receipt of the Transfer Notice or if it requests additional information, within fifteen (15) days after receipt of such additional information (the "Review Period"), the Company may elect to receive the Transfer to itself or to its nominee, upon the terms and conditions in the Transfer Notice, by written notice to the Franchisee. The failure of the Company to deliver such notice shall constitute a waiver of its Right of First Refusal, provided that it has been furnished, in timely fashion, with all of the requisite documents and information.

15.3 Equivalent Consideration. In the event that the attempted Transfer is in a format or is for consideration that the Company cannot practicably or realistically duplicate (including, without limitation, a transaction in which the Franchisee would receive the stock of the Assignee) the Company may elect to pay the equivalent consideration in cash and to modify the Transfer format to reasonably duplicate the proposed Transfer.

15.4 Company Objections/Conditions to Transfer. If the Company does not exercise its Right of First Refusal, it may deliver to the Franchisee, before expiration of the Review Period, written notice of any objection it has to, or any conditions it will impose upon, the proposed Transfer. The failure of the Company to deliver such notice shall constitute a consent to the proposed Transfer.

15.5 Change in Terms/Conditions of Transfer. If the Company does not exercise its Right of First Refusal nor object to the Transfer, the Franchisee shall have the right, for a period of thirty (30) days after the Review Period, to effect the Transfer upon the terms and conditions of the Transfer Notice. If the terms of the Transfer are changed, such changed terms shall be deemed a new offer and the Company shall again have such Right of First Refusal with

respect to them.

**ARTICLE XVI.**
**DEFAULT & TERMINATION.**

16.1 The Company's Right to Terminate Prior to Opening.

A. The Company shall have the right to terminate this Agreement forthwith if:

(1) The Franchisee shall have failed to satisfactorily complete Initial Training. The Franchisee acknowledges that because of the Company's superior skill and knowledge with respect to the training and skill required to manage the Business, the Company's judgment as to whether or not the Franchisee has satisfactorily completed such training may be exercised by the Company in its sole, subjective judgment, exercised in good faith; or

(2) Any financial, personal or other information provided by the Franchisee to the Company in connection with the Franchisee's application for the franchise is materially false, misleading, incomplete or inaccurate.

B. Upon termination, for the reasons set forth in A.(1) or A.(2) above, the Company will return Twenty Five Thousand ($25,000.00) Dollars of the Initial Franchise Fee and retain Twenty Five Thousand ($25,000.00) Dollars.

C. Company may terminate without returning any part of the Franchise Fee if Franchisee does not open for business within 90 days of signing this agreement.

D. If the Company elects to terminate this Agreement pursuant to this Section, the Company shall notify the Franchisee of its said election; and this Agreement shall be null, void and of no effect. Neither party shall have any further right or obligation to the other except those obligations, which, by their nature, survive such termination.

16.2 The Company's Right to Terminate After Opening.

A. Grounds. The Company shall have the right to terminate this Agreement after the Business opens in the following events any of which shall constitute good cause:

(1) Events in which termination shall be effective immediately upon the mailing or delivery of written notice of termination and with respect to which the Franchisee shall have no right to cure the default:

(i) The Franchisee is convicted of, or pleads guilty to, or pleads no contest to, any criminal statute which carries a possible penalty (whether imposed or not) of imprisonment in excess of 30 days); or

(ii) The Franchisee voluntarily or otherwise abandons the Business by failing to operate it for a period of five (5) consecutive business days or more, unless the Business has been closed for a purpose approved by the Company; or

(iii) The Franchisee fails to purchase or maintain the insurance required by this Agreement or fails to reimburse the Company for its purchase of such insurance on behalf of the Franchisee; or

(iv) The Franchisee, after curing any failure of the Franchisee to comply with any requirement of this Agreement after being given notice thereof and a reasonable opportunity to cure such failure, which in no event need be more than thirty (30) days, engages in the same non-compliance whether or not such non-compliance is corrected after notice; or

(v) The Franchisee makes a Transfer or attempted Transfer of the Agreement or of the Business without compliance with the provisions of Sections 14.2 through 14.8 and of the Company's Right of First Refusal in Article XV, above; or

(vi) The Company reasonably determines that operations by the Franchisee will result in substantial danger to public health or safety.

(2) Events in which termination shall be effective within thirty (30) days from the date of such written notice of termination and with respect to which the Franchisee shall have an opportunity to cure any such default within such thirty (30) day period:

(i) Default by the Franchisee of any other obligations under the Agreement; or

(ii) The Franchisee or the Business is declared bankrupt or insolvent, or all or a substantial part of the assets of the Business are assigned to or for the benefit of any creditor, or the Franchisee admits its inability to pay its debts as they become due; or

(iii) The Company and the Franchisee agree in writing to terminate the Franchise; or

(iv) The Franchisee makes any material misrepresentation

relating to the acquisition of the Business or the Franchisee engages in conduct which reflects materially and unfavorably upon the operation and reputation of the Business, the Marks or System; or

(v) The Franchisee fails, for a period of ten (10) days after notification of non-compliance, to comply with any federal, state or local law or regulation applicable to the operation of the Business; or

(vi) The Business is seized, taken over or foreclosed; or a final judgment against the Franchisee is unsatisfied for thirty days (unless a supersedeas or other bond has been filed); or a levy of execution has been made upon any property used in the Business and is not discharged within five days of such levy; or

(vii) The Franchisee fails to pay any royalties or other amounts due the Company or the Affiliate within five (5) days after notice that such are due on more than three (3) occasions in any two (2) year period: or

(viii) The Franchisee is involved in any act or conduct which materially impairs the goodwill associated with the Business, Marks or the System and the Franchisee fails to cure such act of conduct within twenty-four (24) hours of the receipt of notice thereof.

(3) Notwithstanding anything to the contrary contained in this Article 16, the Company has the right to survey all completed projects. If, in any one calendar year, 25% or more of the Franchisee's customers are dissatisfied, the Company, at its option, may take over the Territory and terminate this Agreement. If the Company takes over the Territory it will pay the Franchisee 50% of the Franchisee's last three months sales.

B. Waiver. The Company may, in its sole discretion, waive its right to terminate under one or more sections of this Article as set forth above. Said waiver shall not be deemed continuing nor shall it be considered a precedent for this Agreement or for any other franchise. See Section 20.7, below.

C. Termination Procedure. If the Company elects to exercise its right to terminate this Agreement, it shall do so by giving the Franchisee written notice of termination stating the grounds therefor, advising whether there is an opportunity to cure any default and the effective date of termination. If the state in which the Business is located has a law governing notice and right-to-cure periods, such law shall govern.

D. Cross Default. Any default by the Franchisee of any other

agreement between the Company and the Franchisee or the Affiliate and the Franchisee shall be deemed a default under this Agreement and any default by the Franchisee of this Agreement shall be deemed a default under any and all other agreements between the Company and the Franchisee. If the nature of such default under any other agreement would have permitted the Company to terminate this Agreement if such default had occurred under this Agreement, the Company shall have the right to terminate all of the other agreements between the Company and the Franchisee in the same manner as provided herein for termination of this Agreement.

16.3 Franchisee's Rights to Terminate.

A. Grounds. If the Franchisee is in substantial compliance with this Agreement and the Company breaches any material provision, term or condition, the Franchisee may terminate this Agreement as provided herein.

B. Procedure. The Franchisee shall not have any right to terminate this Agreement or commence an action against the Company for injunctive relief, violation of any state, federal or common law, unless and until:

(1) Written notice setting forth the alleged default in detail has been delivered to the Company by the Franchisee; and

(2) The Company fails to correct, or diligently make all reasonable efforts to correct, the alleged default within thirty (30) days after receipt of such written notice.

C. Required Notice-Waiver of Breach. If the Franchisee fails to give the Company written notice of an alleged default of this Agreement within one (1) year from the date that Franchisee has knowledge of, determines, or is of the opinion that there has been a default by the Company, then the alleged default shall be deemed to be condoned, approved and waived by the Franchisee and the alleged default shall not be deemed to be a default of this Agreement.

## ARTICLE XVII.
## OBLIGATIONS UPON TERMINATION

17.1 Obligations. In the event of the termination or expiration of this Agreement, whether by reason of default, lapse of time or other cause, the Franchisee shall: (A) promptly pay all amounts owed to the Company; (B) promptly return to the Company the Manual and other confidential materials; (C) maintain confidentiality of all proprietary information furnished by the Company; (D) immediately cease using any of the Marks; (E) direct the transfer of all telephone listings, numbers and directory advertising, to the Company; and (G) pay all costs, including attorneys' fees and costs, incurred

by the Company in terminating this Agreement.

17.2 Survival of Obligations. The expiration or termination of this Agreement shall be without prejudice to any of the rights and remedies of the Company against the Franchisee with respect to the foregoing obligations, non-competition covenants and other like matters that reasonably would survive the end of this Agreement.

**ARTICLE XVIII.**
**NON-COMPETITION COVENANTS**

18.1 In-Term Covenant Not to Compete. The Franchisee agrees that during the Term of this Agreement, and the Term of any Successor Agreement, the Franchisee will not, either directly or indirectly, engage in any other business which offers, provides or sells the same or similar services provided by the Franchisee hereunder, or engage in any of the activities which this Agreement contemplates will be engaged in by the Franchisee, or offers or sells any other service (or component thereof) which comprises or may in the future comprise a part of the System (or any service confusingly similar thereto) as an owner, partner, investor, shareholder, director, officer, employee, principal, agent, advisor, or consultant, nor shall the Franchisee divert any business from the Business to any other entity. It is the intention of this provision to preclude not only direct competition but also all forms of indirect competition, such as consultation for competitive businesses, service as an independent contractor for such competitive businesses, or any assistance or transmission of information of any kind or nature whatsoever which would be of any material assistance to a competitor.

During the term of this Agreement or any Successor Agreement, and for one (1) year thereafter, the Franchisee shall not hire personnel of the Company or of any other franchisee of the Company.

It is the intention of this provision that any person or entity having any legal or beneficial interest in or traceable to, down or through the Franchisee be bound by the provisions of this covenant, including (without limitation) the Franchisee's spouse, brother, brother-in-law, sister, sister-in-law, parents, parents-in-law, child, son-in-law or daughter-in-law; any direct or indirect beneficiary; guarantor; any partner (general or limited) or owner of the Franchisee; and, any other such related person or entity, regardless of how many levels or tiers may be between any such described person or entity and the Franchisee.

If the Franchisee is a corporation, the Franchisee shall cause its shareholders, directors, officers and employees to refrain from any of the foregoing competitive activities in any manner, which the Company may

reasonably, request.

If the Franchisee is a partnership or proprietorship, the Franchisee shall cause each partner or proprietor to refrain from any of the foregoing competitive activities.

18.2 After Termination. The Franchisee may not solicit, contact or do any work for any customer or potential customer developed as a HEALTH RECOVERY franchise at any time nor may they operate a business which incorporates bio-chemical restoration and repair.

18.3 Scope. The covenants in this Article XVIII shall not be applicable to any Business operated by the Franchisee under another Franchise Agreement with the Company.

18.4 Enforcement of Covenants Not to Compete. The Franchisee acknowledges that violation of the covenants not to compete contained in this Agreement would result in immediate and irreparable injury to the Company for which no adequate remedy at law will be available. Accordingly, the Franchisee hereby acknowledges that the Franchisor may seek to obtain the entry of an injunction prohibiting any conduct by the Franchisee in violation of the terms of those covenants not to compete set forth in this Agreement. The Franchisee expressly agrees that it may conclusively be presumed that any violation of the terms of said covenants not to compete was accomplished by and through the Franchisee's unlawful utilization of the Company's confidential information, know-how, methods and procedures. Further, the Franchisee expressly agrees that the existence of any claims it may have against the Company, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by the Company of the covenants not to compete set forth in this Agreement. The Franchisee further agrees to pay all costs and expenses (including reasonable attorneys' and experts' fees) incurred by the Company in connection with the enforcement of those covenants not to compete set forth in this Agreement.

## ARTICLE XIX.
## ARBITRATION

19.1 Agreement to Arbitrate. All controversies, disputes or claims arising between the Company and the Franchisee (including any claim against the Affiliate Company's officers, directors, shareholders, agents and employees, in their capacity as such, or against the owners and guarantors of the Franchisee, if applicable) in connection with, arising from, or with respect to: (A) any provision of this Agreement or any other agreement related to this Agreement between the parties; (B) the relationship of the parties hereto; (C) the validity of this Agreement or any other agreement between

the parties related to this Agreement, or any provision thereof; or (D) any specification, standard or operating procedure relating to the establishment or operation of the Business (except controversies, disputes or claims relating to the Marks) which shall not be resolved within thirty (30) days after either party shall notify the other in writing of such controversy, dispute or claim, may be submitted for arbitration on demand of either party. Such arbitration proceedings shall be conducted before a single arbitrator at the Company's offices or at another location specified by the Company and, except as otherwise provided in this Agreement, shall be conducted in accordance with the then current Commercial Arbitration Rules of the American Arbitration Association. The arbitrator shall have the right to award or include in the award any relief which is deemed proper in the circumstances, including without limitation, money damages (with interest on unpaid amounts from the due date), specific performance and injunctive relief. The award and decision of the arbitrator shall be conclusive, binding and non-appealable upon all parties hereto and judgement upon the award may be entered in any court of competent jurisdiction. The Company and the Franchisee (and their respective owners and guarantors, if applicable) hereby waive to the fullest extent permitted by law, their right to or claim for any punitive or exemplary damage against the other and agree that in the event of a dispute between them each shall be limited to the recovery of any actual damages sustained. The provisions of this Article shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement. The Franchisee and the Company agree that arbitration shall be conducted on an individual, not a class-wide, basis.

19.2 Severability. The provisions of this Article shall be construed as independent of any other covenant or provision of this Agreement; provided that, if a court of competent jurisdiction determines that any such provisions are unlawful in any way, such court shall modify or interpret such provisions to the minimum extent necessary to have them comply with the law. Notwithstanding any provisions of this Agreement relating to the state laws under which this Agreement shall be governed and construed, all issues relating to arbitrability or the enforcement of the agreement to arbitrate contained herein shall be governed by the United States Arbitration Act (9 U.S.C. 1 et seq.) and the federal common law of arbitration.

19.3 Mediation. Prior to any arbitration proceeding taking place, the Company or the Franchisee may, at its respective option, elect to (A) have the arbitrators conduct, in a separate proceeding prior to the actual arbitration, a preliminary hearing, at which hearing testimony and other evidence may be presented and briefs may be submitted, including without limitation a brief setting forth the then applicable statutory or common law methods of measuring damages in respect of the controversy or claim being arbitrated, or (B) submit the controversy or claim to non-binding mediation before the

arbitrators or other mutually agreeable mediator, in which event both parties shall execute a suitable confidentiality agreement.

19.4 Exception to Arbitration. Nothing in this Agreement, including in particular the provisions of Section 19.1, shall be construed as limiting or precluding the Company, the Affiliate or the Franchisee from bringing any action in any court of competent jurisdiction for injunctive or other extraordinary relief, without the necessity of posting any bond (and if bond shall nevertheless be required by a court of competent jurisdiction, the parties agree that the sum of $100 shall be sufficient bond), as the Company or the Franchisee deem necessary or appropriate to (A) compel the other to comply with its obligations hereunder with respect to the use or display of the Marks or to otherwise protect the Marks; (B) compel the other to comply with its obligations upon termination or expiration of this Agreement or any Successor Agreement; and (C) prohibit any act or omission by the other, or their respective employees, that constitutes a violation of applicable law, is dishonest or misleading to the Franchisee's customers or prospective customers, or other Franchised Businesses, or constitutes a danger to the Franchisee's employees, or customers or to the public, or may impair the good will associated with the Marks or System. The parties agree to arbitrate any such dispute concurrently with and subsequent to the grant or denial of such injunctive relief.

## ARTICLE XX.
## MISCELLANEOUS

20.1 Severability. All provisions of this Agreement are severable and this Agreement shall be interpreted and enforced as if all completely invalid and unenforceable provisions were not contained herein and partially valid and enforceable provisions shall be enforced to the extent valid and enforceable. If any applicable and binding law or rule of any jurisdiction requires a greater prior notice of the termination or refusal to extend the Term of this Agreement or prior notice of the refusal to grant the right to obtain a Successor Agreement than is required herein or the taking of some other action not required hereunder or if under any applicable and binding law or rule of any jurisdiction, any provision of this Agreement or any specification, standard or operating procedure prescribed by the Company is invalid or unenforceable, the prior notice or other action required by such law or rule shall be substituted for the notice requirements hereof, or such invalid or unenforceable provision, specification, standard or operating procedure shall be modified to the extent required to be valid and enforceable. Such modifications to this Agreement shall be effective only in

such jurisdictions and shall be enforced as originally made and entered into in all other jurisdictions.

20.2 No Third Party Rights. Anything to the contrary herein notwithstanding, nothing in this Agreement is intended, nor shall it be deemed, to confer upon any third party other than the Company, the Affiliate, the Indemnitees identified in Section 11.3, or the Franchisee and permitted successors and assigns, any rights or remedies under or by reason of this Agreement.

20.3 Captions. All captions herein are intended solely for the convenience of the parties and none shall be deemed to affect the meaning or construction of any provision hereof.

20.4 Counterparts. This Agreement may be executed in one or more counterparts and each copy so executed shall be deemed an original but all copies together shall constitute one agreement.

20.5 Governing Law. This Agreement takes effect upon its acceptance and execution by the Company and shall be interpreted and construed in accordance with, and the franchise and any dispute between the parties governed by, the laws of the state of the principal office of the Company without giving effect to the choice of law rules thereof, which law shall prevail in any event of conflict of law, except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. 1051 et seq), or the United States Arbitration Act (9 U.S.C. 1 et seq).

20.6 Choice of Forum. The Company and the Franchisee agree that any action brought by one of them against the other (which is not to be arbitrated pursuant hereto or pursuant to law) shall be instituted in the state court within which the principal office of the Company is venued and which has subject matter jurisdiction thereof or in the related U.S. District Court. Each party hereby irrevocably waives any objection they may have to the jurisdiction or the venue of such Court(s).

20.7 Waiver. The Company and the Franchisee may, by written instrument, unilaterally waive any obligation or restriction upon the other under this Agreement. Except as provided to the contrary herein, no acceptance by the Company of any payment by the Franchisee and no failure, refusal or neglect of the Company or the Franchisee to exercise any right under this Agreement or to insist upon full compliance by the other with its obligations hereunder, including, without limitation, any mandatory specification, standard or operating procedure, shall constitute a waiver of any provision of this Agreement.

20.8 Royalty or Other Fees. The Franchisee shall not, on the grounds of alleged non-performance by the Company of any of its obligations to the Franchisee, withhold payments of Royalty Fee or any other amounts due to the Company.

20.9 Attorneys' Fees. In the event the Company institutes a suit, action or proceeding to enforce any provision of this Agreement, the Company shall be entitled to recover from the Franchisee reasonable attorneys' fees to be set by the court in addition to costs or disbursements provided by law.

20.10 Notices; Approvals; Force Majeure; Miscellaneous.

A. Notices. All notices required herein shall be in writing, and (i) sent by registered or certified mail addressed to the Company or the Franchisee at their respective principal offices first above written or at such other address as the Company or the Franchisee may designate in writing; or (ii) hand delivered; or (iii) by Federal Express or other private delivery; or (iv) by Facsimile communication.

B. Approvals. Unless specifically provided otherwise, the Franchisee hereby waives, any claim that the Company has unreasonably withheld or delayed any consent or approval to a proposed act by the Franchisee under this Agreement.

C. Force Majeure. Whenever a time period is specified herein within which the Franchisee or the Company has a duty to perform some act, such period shall be extended for a time period corresponding to the duration of any delay caused by events or circumstances beyond the reasonable control of such party.

20.13 Binding Effect and Modifications. This Agreement is binding upon the parties and their respective executors, administrators, heirs, assigns and successors, and shall not be modified except by written agreement, except that the Company has the right to unilaterally change the Manual and to make such other changes, additions and modifications as set forth herein.

20.14 Complete Agreement. This Agreement, together with the other Exhibits to the Offering Circular, contains the complete agreement between the parties and there are no promises, representations or inducements except as herein provided.

20.15 Submission of Agreement. The submission of this Agreement does not constitute an offer and this Agreement shall become effective only upon the execution hereof by the Company and the Franchisee. The date of

execution by the Company shall be considered the date of execution of this Agreement.

**THIS AGREEMENT SHALL NOT BE BINDING ON THE COMPANY UNLESS AND UNTIL IT SHALL HAVE BEEN SIGNED BY AN AUTHORIZED OFFICER. UNTIL SO SIGNED, THE COMPANY MAY UNILATERALLY REFUSE TO ENTER INTO THIS AGREEMENT WITHOUT LIABILITY OF ANY KIND TO ITSELF, THE AFFILIATE, OR THEIR OFFICERS, DIRECTORS, EMPLOYEES OR AGENTS.**

**THE COMPANY DISCLAIMS ANY WARRANTY OR REPRESENTATION AS TO THE POTENTIAL SUCCESS OF THE BUSINESS.**

**THIS IS A LEGAL DOCUMENT WHICH GRANTS SPECIFIC RIGHTS TO AND IMPOSES CERTAIN OBLIGATIONS ON THE COMPANY AND THE FRANCHISEE. CONSULT LEGAL COUNSEL TO BE SURE THAT YOU UNDERSTAND YOUR RIGHTS AND DUTIES.**

**FRANCHISEE HAS READ ALL OF THIS AGREEMENT AND HEREBY ACCEPTS AND AGREES TO ALL OF ITS PROVISIONS, COVENANTS AND CONDITIONS.**

IN WITNESS HEREOF, the parties have signed this Agreement as of the day and year first above written.

| | |
|---|---|
| **"FRANCHISEE"** | **"COMPANY"** |
| [signature] | **HEALTH RECOVERY SYSTEMS, INC.** |
| By________________ | By Joan Matthews Larson |
| Its________________ | Its President |

Health Recovery
FA – 04/05/00

execution by the Company shall be considered the date of execution of this Agreement.

**THIS AGREEMENT SHALL NOT BE BINDING ON THE COMPANY UNLESS AND UNTIL IT SHALL HAVE BEEN SIGNED BY AN AUTHORIZED OFFICER. UNTIL SO SIGNED, THE COMPANY MAY UNILATERALLY REFUSE TO ENTER INTO THIS AGREEMENT WITHOUT LIABILITY OF ANY KIND TO ITSELF, THE AFFILIATE, OR THEIR OFFICERS, DIRECTORS, EMPLOYEES OR AGENTS.**

**THE COMPANY DISCLAIMS ANY WARRANTY OR REPRESENTATION AS TO THE POTENTIAL SUCCESS OF THE BUSINESS.**

**THIS IS A LEGAL DOCUMENT WHICH GRANTS SPECIFIC RIGHTS TO AND IMPOSES CERTAIN OBLIGATIONS ON THE COMPANY AND THE FRANCHISEE. CONSULT LEGAL COUNSEL TO BE SURE THAT YOU UNDERSTAND YOUR RIGHTS AND DUTIES.**

**FRANCHISEE HAS READ ALL OF THIS AGREEMENT AND HEREBY ACCEPTS AND AGREES TO ALL OF ITS PROVISIONS, COVENANTS AND CONDITIONS.**

IN WITNESS HEREOF, the parties have signed this Agreement as of the day and year first above written.

| "FRANCHISEE" | "COMPANY" |
| --- | --- |
| [signature] | HEALTH RECOVERY SYSTEMS, INC. |
| By____________ | By Joan Matthews Larson |
| Its____________ | Its President |

# EXHIBIT B

## TERRITORY

The Territory is the area below:

A 10 mile radius from the city limits of Fort Collins, Colorado.

## EXHIBIT C

## PERSONAL GUARANTY AND ASSUMPTION OF FRANCHISEE'S OBLIGATIONS

In consideration of, and as an inducement to, Health Recovery Systems, Inc. execution of that certain Franchise Agreement (the "Agreement") by and between the franchisee named therein (the "Franchisee") and Health Recovery Systems, Inc. (the "Company") of even date herewith, each of the undersigned hereby personally and unconditionally: (1) guarantees to the Company, and its successors and assigns, for the term of the Agreement and thereafter as provided in the Agreement, that the Franchisee shall punctually pay and perform each and every undertaking, agreement and covenant set forth in the Agreement; and (2) agrees to be personally bound by, and personally liable for the breach of, each and every provision in the Agreement.

Each of the undersigned waives:

(1) acceptance and notice of acceptance by the Company of the foregoing undertakings;

(2) notice of demand for (a) payment of any indebtedness, or (b) performance of any obligations hereby guaranteed;

(3) protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligation hereby guaranteed;

(4) any right they may have to require that an action be brought against Franchisee or any other person as a condition of liability; and

(5) any and all other notices and legal or equitable defenses to which they may be entitled.

Each of the undersigned consents and agrees that:

(1) direct and immediate liability under this guaranty shall be joint and several;

(2) any payment or performance required under the Agreement shall be rendered upon demand if Franchisee fails or refuses punctually to do so;

(3) such liability shall not be contingent or conditioned upon pursuit by the Company of any remedies against Franchisee or any other person; and

(4) such liability shall not be diminished, relieved or otherwise

CASE 0:05-cv-00880-JMR-FLN Doc. 1-2 Filed 05/04/05 Page 24 of 26

affected by any extension of time, credit or other indulgence which the Company may occasionally grant to Franchisee or to any other person, including the acceptance of any partial payment or performance, or the compromise or release of any claims, none of which shall in any way modify or amend this guaranty, which shall be continuing and irrevocable during the term of the Agreement.

IN WITNESS WHEREOF, each of the undersigned has hereunto affixed his signature on the same day and year as the Agreement was executed.

WITNESS

Joan Matthews Larson
President

GUARANTOR(S)

Joseph Eisele

**EXHIBIT C**

**PERSONAL GUARANTY AND ASSUMPTION OF FRANCHISEE'S OBLIGATIONS**

In consideration of, and as an inducement to, Health Recovery Systems, Inc. execution of that certain Franchise Agreement (the "Agreement") by and between the franchisee named therein (the "Franchisee") and Health Recovery Systems, Inc. (the "Company") of even date herewith, each of the undersigned hereby personally and unconditionally: (1) guarantees to the Company, and its successors and assigns, for the term of the Agreement and thereafter as provided in the Agreement, that the Franchisee shall punctually pay and perform each and every undertaking, agreement and covenant set forth in the Agreement; and (2) agrees to be personally bound by, and personally liable for the breach of, each and every provision in the Agreement.

Each of the undersigned waives:

(1) acceptance and notice of acceptance by the Company of the foregoing undertakings;

(2) notice of demand for (a) payment of any indebtedness, or (b) performance of any obligations hereby guaranteed;

(3) protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligation hereby guaranteed;

(4) any right they may have to require that an action be brought against Franchisee or any other person as a condition of liability; and

(5) any and all other notices and legal or equitable defenses to which they may be entitled.

Each of the undersigned consents and agrees that:

(1) direct and immediate liability under this guaranty shall be joint and several;

(2) any payment or performance required under the Agreement shall be rendered upon demand if Franchisee fails or refuses punctually to do so;

(3) such liability shall not be contingent or conditioned upon pursuit by the Company of any remedies against Franchisee or any other person; and

(4) such liability shall not be diminished, relieved or otherwise

affected by any extension of time, credit or other indulgence which the Company may occasionally grant to Franchisee or to any other person, including the acceptance of any partial payment or performance, or the compromise or release of any claims, none of which shall in any way modify or amend this guaranty, which shall be continuing and irrevocable during the term of the Agreement.

IN WITNESS WHEREOF, each of the undersigned has hereunto affixed his signature on the same day and year as the Agreement was executed.

WITNESS GUARANTOR(S)