ORIGINAL

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| HEALTH RECOVERY CENTER, INC., a Minnesota corporation, and<br><br>HEALTH RECOVERY SYSTEMS, INC., a Minnesota corporation,<br><br>Plaintiffs,<br><br>v.<br><br>INNERBALANCE LLC, a Colorado limited liability company,<br><br>INNERBALANCE HEALTH CENTER, LLC, a Colorado limited liability company,<br><br>INNERBALANCE HEALTH SYSTEMS, LLC, a Colorado limited liability company,<br><br>JOSEPH W. EISELE, and<br><br>RON GRAHAM,<br><br>Defendants. | Civil File No. 05-880 JMR/FLN<br><br>**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

## INTRODUCTION

Plaintiff Health Recovery Center developed a unique model for treating people suffering from chemical dependency. The Health Recovery treatment model includes laboratory testing and bio-chemical restoration and repair in addition to counseling. The course of treatment is tailored to the client's particular addiction and the results of the client's lab testing. The Health Recovery treatment model is a trade secret that represents decades of work in the field. The Health Recovery treatment model is set forth in a five-

SCANNED
MAY 04 2005
U.S. DISTRICT COURT MPLS

volume Operations Manual. Health Recovery Center draws clients from around the country. Since it opened in 1981, Health Recovery Center has treated thousands of people suffering from drug and alcohol addiction. Health Recovery Center owns the federally registered trademark HEALTH RECOVERY CENTER, INCORPORATED.

In August 2000, Defendants gained access to Plaintiffs' intellectual property, including Plaintiffs' trademarks, the Operations Manual and other confidential information and trade secrets, through a Franchise Agreement with Plaintiff Health Recovery Systems. Defendants used Plaintiffs' intellectual property to open and operate a Health Recovery franchise in Colorado. Defendants, however, breached the Franchise Agreement. By August 2004, Defendants' breaches included:

- Failure to pay the required monthly royalty fee;
- Failure to pay the required monthly advertising fee;
- Failure to provide monthly verified reports of gross revenues; and
- Failure to allow audits of financial records and client records

In view of Defendants' breaches, Health Recovery Systems terminated the Franchise Agreement effective November 2004.

The Franchise Agreement requires that upon termination the franchisee stop using, and return, Plaintiffs' intellectual property. The Franchise Agreement also requires that upon termination the franchisee transfer its telephone numbers, telephone listings and directory advertising to Health Recovery Systems. The Franchise Agreement also contains a post-termination covenant not to compete. In violation of these provisions,

defendants are operating after termination as they did before termination. After termination, defendants have, among other misconduct:

- Continued to use Plaintiffs' trademark or confusingly similar variants;
- Continued to hold themselves out as a Health Recovery franchisee;
- Kept and continued to use Plaintiffs' trade secrets and confidential information, including the Operations Manual; and
- Continued to use the phone numbers that they promoted and used while a Health Recovery franchisee

Defendants' conduct not only violates the post-termination provisions of the Franchise Agreement, but also the Lanham Act and the Minnesota Uniform Trade Secrets Act.

Defendants' misconduct is irreparably injuring Plaintiffs. Defendants should be preliminarily enjoined from any further use of Plaintiffs' trademark and Plaintiffs' confidential information and trade secrets, including the Operations Manual. Defendants should also be required immediately to return all confidential and trade secret materials to Plaintiffs, to transfer to Plaintiffs all telephone numbers, telephone listings and directory advertising, and to comply with all of their post-termination obligations under the Franchise Agreement, including their post-termination covenant not to compete.

## BACKGROUND

### I. The Health Recovery Treatment Model

Health Recovery Center provides chemical dependency treatment services. Declaration of Joan Mathews Larson ("Mathews Larson Decl.") ¶3. Health Recovery Center was founded in approximately 1981 by Joan Mathews Larson. Id. Ms. Larson

became involved with chemical dependency treatment as a result of a family tragedy. Id. Ms. Larson's husband died of a heart attack in 1970 at the age of 42. Id. Ms. Larson' teenage son Rob, in the wake of his father's death, became addicted to alcohol. Id. Although he completed in-patient treatment at a hospital, Rob continued to suffer from depression and mood swings, and shortly afterward he took his own life, at the age of 17. Id. After her son's death, Ms. Larson sought to develop an alternative to the traditional treatment for chemical dependency, which focused on "talk therapy" and had been ineffective for her son. Id.

As a result of her efforts, Ms. Larson developed a unique, holistic chemical dependency treatment system ("the Health Recovery treatment model"), which combines therapy with extensive laboratory testing, bio-chemical restoration and repair, nutrition counseling and nutrient therapies. Mathews Larson Decl. ¶4. The Health Recovery treatment model seeks to bio-chemically correct cravings, mood swings, depression, anxiety, and other symptoms often experienced by people with chemical dependency problems. Id. The Health Recovery treatment model's program of biochemical restoration and repair and nutrient therapy includes the use of medically prescribed intravenous solutions and nutritional supplements. Id.

The precise course of treatment is tailored to the client's specific addiction and the results of the client's lab tests. Mathews Larson Decl. ¶5. The treatment for addiction to cocaine, for example, is different from the treatment program for addiction to alcohol. Id. Even among clients addicted to the same substance, the treatment program may vary depending on the results of the individual client's laboratory testing. Id.

Since it opened in 1981, Health Recovery Center has used the Health Recovery treatment model to successfully treat thousands of people seeking to overcome chemical dependency. Mathews Larson Decl. ¶6. Health Recovery Center owns U.S. Trademark Registration No. 2,296,150, for the mark HEALTH RECOVERY CENTER, INCORPORATED, for use in connection with "counseling and treatment services for drug and alcoholic problems, personal and emotional problems, food addiction, depression, cerebral allergy and candida related complex problems." Id. ¶7; Complaint, Exhibit F.

Over the years, Plaintiffs have developed extensive educational and promotional materials relating to the Health Recovery treatment model. Mathews Larson Decl. ¶8. These materials include printed brochures, television ads, and an informational video featuring Joan Mathews Larson. Id. Many of these materials were part of a standard "response packet" developed by Plaintiffs to be sent in response to inquiries from potential clients. Id. The response packets explained the Health Recovery treatment model and its origins, and how it differs from traditional approaches to chemical dependency treatment. Id.

## II. The Health Recovery Operations Manual

The treatment methods, processes and formulations used in the Health Recovery treatment model are set forth in a five-volume Operations Manual. Mathews Larson Decl. ¶9. The Operations Manual prescribes a regimen of laboratory testing to be conducted on the client. Id. The Operations Manual allows a trained treatment provider to tailor the treatment program to meet the client's particular addiction based on the

results of the lab testing. Id. The Operations Manual also sets forth Plaintiffs policies, procedures and methods of business operation. Id.

The Operations Manual is confidential and proprietary. Mathews Larson Decl. ¶10. A single master Operations Manual is kept in an office at Plaintiffs' Minneapolis location. Declaration of Cynthia Mathews ("C. Mathews Decl.") ¶5. The printed master Operations Manual is generated from an electronic version kept as a password protected computer file. Id. Plaintiffs' employees who have access to the Operations Manual or portions of it, such as doctors, nurses and counselors, are required to execute confidentiality agreements. C. Mathews Decl. ¶5, Exhibit A. These employees may keep portions of the Operations Manual in their offices, if necessary to perform their jobs. Id. ¶5. Plaintiffs also educate their employees on the importance of protecting confidential information and materials, such as the Operations Manual. Id. Franchisees, who receive a copy of the Operation Manual are also contractually bound to maintain the secrecy of the Operations Manual. Id.

## III. InnerBalance Becomes A Health Recovery Franchisee

To make its treatment method more broadly available, Health Recovery Center sought to develop a franchise program through Plaintiff Health Recovery Systems. Mathews Larson Decl. ¶11. Health Recovery Systems, has exclusive rights to franchise the Health Recovery treatment model. C. Mathews Decl. ¶4. Health Recovery Systems also has a license to the HEALTH RECOVERY CENTER, INCORPORATED trademark, with a right to sublicense franchisees. Id.

In August 2000, InnerBalance LLC entered into a Franchise Agreement with Health Recovery Systems, under which InnerBalance LLC would operate a chemical

dependency treatment center using the Health Recovery treatment model in the area of Fort Collins, Colorado. See Complaint, Exhibit A. The Franchise Agreement was executed by Eisele on behalf of InnerBalance LLC. Simultaneously with the execution of the Franchise Agreement, Eisele and Graham executed personal guarantees assuming personal responsibility for InnerBalance LLC's performance under the Franchise Agreement and accepting personal liability for InnerBalance LLC's failure to comply with the Franchise Agreement. See Complaint, Exhibits D and E.[1]

As a franchisee, InnerBalance received extensive training in the Health Recovery treatment model and a copy of the Operations Manual. Mathews Larson Decl. ¶12. InnerBalance also obtained copies of the educational and promotional materials prepared by Plaintiffs, including printed brochures, television ads, and an informational video featuring Joan Mathews Larson, as well as the standard "response packet" to be sent in response to inquiries from potential clients. Id.

1 Although the Franchise Agreement was between InnerBalance, LLC and Health Recovery Systems, Inc., InnerBalance has recently asserted that two other entities – InnerBalance Health Center and InnerBalance Health Systems – not InnerBalance, have acted as franchisee under the Franchise Agreement. For convenience all the InnerBalance entities, and the guarantors Eisele and Graham are jointly referred to as "InnerBalance."

## IV. InnerBalance Breaches The Franchise Agreement

From the start of the franchise relationship, Plaintiffs experienced problems with InnerBalance. Nevertheless, Health Recovery Systems spent years working with InnerBalance trying to bring it into compliance with the Franchise Agreement. These efforts were to no avail. By August of 2004, InnerBalance's breaches of the Franchise Agreement included the following:

- Failure to pay the monthly Royalty Fee of 10% of gross revenues, which was required to be paid "without offset, credit, or deduction of any kind." Franchise Agreement 3.5, 9.2.

- Failure to pay the monthly National Advertising Fee of 2% of gross revenues, which was required to be paid "without offset, credit, or deduction of any kind." Franchise Agreement 3.9, 9.2, 9.4.

- Failure to provide monthly, verified reports of gross revenues. Franchise Agreement 13.1.

- Failure to allow Health Recovery Systems to conduct "complete audits . . . of the affairs and records relating to the operation of the Business." Franchise Agreement 13.3.

See C. Mathews Decl. ¶6. InnerBalance has not paid a Royalty Fee or National Advertising Fee since July 2004. Id. InnerBalance has failed to provide a verified monthly report of gross revenues since July 2004. Id. InnerBalance has never permitted Health Recovery Systems to conduct a complete audit of "the affairs and records relating to the operation of the Business." Id. In particular, while a franchisee InnerBalance never allowed Health Recovery Systems access to its financial records, or to its client charts and records. Id.

## V. Health Recovery Systems Terminates The Franchise Agreement

On August 27, 2004, Health Recovery Systems gave InnerBalance a Notice of Default, which: 1) identified each of InnerBalance's known breaches of the Franchise Agreement; 2) gave InnerBalance 60 days to cure it breaches; and 3) provided that if InnerBalance did not cure, the Franchise Agreement would terminate effective 90 days from the date of the Notice. See Complaint, Exhibit G. InnerBalance did not cure. Accordingly, the Franchise Agreement between InnerBalance and Health Recovery Systems terminated on November 25, 2004. Larson Mathews Decl. ¶13.

## VI. InnerBalance's Post-Termination Obligations Under The Franchise Agreement

The Franchise Agreement contains a number of post-termination obligations that bind InnerBalance. Section 17.1 of the Franchise Agreement provides that

> In the event of the termination ... of this agreement, the Franchisee shall:
>
> * * *
>
> (B) promptly return to the Company the [Operations] Manual and other confidential materials;
>
> (C) maintain confidentiality of all proprietary information
>
> (D) immediately cease using any of the Marks; [and]
>
> (E) direct the transfer of all telephone listings, numbers and directory advertising, to the Company.

Section 18.2 of the Second Addendum to the Franchise Agreement, see Complaint Exhibit C, provides that after termination of the Franchise Agreement, InnerBalance:

> **may not** solicit, contact or do any work for any customer or potential customer developed as a HEALTH RECOVERY franchise . . . nor may [InnerBalance] **operate a business**

> **which incorporates bio-chemical restoration and repair**, except to the extent that [InnerBalance] can demonstrate the operation of a business which incorporates bio-chemical restoration and repair was being done by [InnerBalance] prior to this Franchise Agreement. . . . Notwithstanding any prior operation of a business. . . , [InnerBalance] **may not use any materials, systems, formulas, processes or methods which were developed as a HEALTH RECOVERY franchisee**.

(Emphasis added.)

## VII. InnerBalance Breaches Its Post-Termination Obligations

InnerBalance has violated its post-termination obligations under the Franchise Agreement. InnerBalance has not returned any of Plaintiffs' confidential or trade secret materials. C. Mathews Decl. ¶7. Instead, InnerBalance is apparently using those material to provide treatment under the Health Recovery treatment model.

InnerBalance is still promoting and offering the Health Recovery treatment model. After termination, InnerBalance held itself out as a Health Recovery Center, and represented that it employs the treatment model developed Ms. Larson. Declaration of Greg Bailey ("Bailey Decl.") Exhibit A. After termination, InnerBalance continued to use the educational and promotional materials it obtained and used as a Health Recovery Franchisee. Bailey Decl., Exhibits A, B, C and D. These materials contain many references to Health Recovery Center and the treatment model developed by Joan Mathews Larson. Id. After termination, InnerBalance continued to distribute an informational video tape featuring Ms. Larson explaining the differences between the Health Recovery treatment model and traditional treatment models. Id. In some instances after termination, InnerBalance sent out response packets which copy text from Plaintiffs' response packet verbatim, while omitting the Health Recovery Center name.

Declaration of Shirley Bingham ("Bingham Decl.") Exhibit A. After termination InnerBalance continued to run television advertisements produced by Plaintiffs promoting the Health Recovery treatment model. Mathews Larson Decl. ¶ 15. InnerBalance is using the same telephone numbers that it used while a franchisee or while promoting itself as affiliated with Health Recovery Center. See C. Mathews Decl. ¶8.

## ARGUMENT

A motion for preliminary injunction is proper where the moving party demonstrates that: 1) it has a likelihood of success on the merits; 2) it will suffer irreparable harm in the absence of an injunction; 3) the balance of hardships favors the grant of an injunction; and 4) the public interest favors the grant of an injunction. Dataphase Sys., Inc. v. CL Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981). All of the Dataphase factors favor the grant of Plaintiffs' motion.[2] Section 20.5 of the Franchise Agreement provides that any dispute between the parties is to be governed by Minnesota law.

### I. Plaintiffs' Have Established A Likelihood Of Success On The Merits

#### A. Plaintiffs Are Likely To Succeed On Their Claims Of Trademark Infringement and Unfair Competition

Section 1.5 of the Franchise Agreement gave InnerBalance a license to use Health Recovery Center trademarks, service marks, and logos, including the federally registered HEALTH RECOVERY CENTER, INCORPORATED trademark (referred to in the

---

[2] Section 19.1 of the Franchise Agreement contains an arbitration clause. Section 19.4 of the Franchise Agreement provides that actions like this one, seeking injunctive relief, are exempt from the arbitration clause. Plaintiffs anticipate commencing an arbitration against defendants to recover damages resulting from post-termination conduct. The parties are currently involved in arbitration of damages claims relating to pre-termination conduct.

Franchise Agreement as "the Marks"). See Complaint, Exhibit A (Franchise Agreement, Sections 1.4, 1.5). InnerBalance "acknowledged the validity of the marks and that they are the sole property" of Plaintiffs. Id. (Franchise Agreement, Section 8.1). Upon termination, InnerBalance was required to "immediately cease using any of the Marks." Id. (Franchise Agreement, Section 17.1(D)).

Despite the termination of the Franchise Agreement, Inner Balance has used "the marks," including the federally registered HEALTH RECOVERY CENTER, INCORPORATED, trademark or confusingly similar variants, in operating and promoting their treatment services: in online telephone directories; in signage at its offices; when answering the telephone; on business cards handed out to prospective clients; in printed brochures and video tapes; and in television advertising. Bailey Decl., Exhibits A, B, C, D; Mathews Larson Decl. ¶15.

The test for trademark infringement and unfair competition under the Lanham Act, in short, is whether the defendant's conduct is likely to cause confusion, mistake or deception as to source, origin, sponsorship or affiliation between Plaintiffs and Defendants or their respective goods or services. See 15 U.S.C. §§1114, 1125. InnerBalance's conduct creates a likelihood of confusion. "When, as in the present case, the alleged infringer is a former licensee of the trademark owner, the 'quantum of proof necessary to establish a likelihood of confusion' can be less than in cases involving non-licensees. Country Inn & Suites by Carlson, Inc. v. Two H.O. Partnership, 2001 WL 1587903, *2, n.1 (D. Minn. 2001), quoting Downtowner/Passport International Hotel Corp. v. Norlew, Inc., 841 F.2d 214, 219 (8th Cir. 1988).

> Common sense compels the conclusion that a strong risk of consumer confusion arises when a terminated franchisee continues to use the former franchisor's trademarks.

Burger King Corp. v. Mason, 710 F.2d 1480, 1492 (11th Cir. 1983), cert. denied, 465 U.S. 1102 (1984), cited with approval in Downtowner/Passport International, 841 F.2d at 219.

The HEALTH RECOVERY CENTER, INCORPORATED trademark is strong and federally registered. See Complaint, Exhibit F. The federal registration constitutes prima facie evidence of the validity of the mark, and of Health Recovery Center's ownership of the mark and exclusive right to use the mark in commerce on or in connection with the goods or services stated in the registration. 15 U.S.C. §1057(b). InnerBalance has used the registered mark or confusingly similar variations of it on services identical to those covered by Health Recovery Center's registration. InnerBalance did so with the apparent intent to pass its services off as those of, or as being affiliated with, Health Recovery Center.

Plaintiffs have established a likelihood of success on the merits of their claim of trademark infringement and unfair competition.

### B. Health Recovery Systems Is Likely To Succeed On Its Claims For Breach Of The Franchise Agreement

#### 1. Inner Balance Is Violating Its Obligation To Return Confidential Information

Section 17.1(b) of the Franchise Agreement requires that InnerBalance return confidential information upon termination. Further, pursuant to Section 7.14 of the Franchise Agreement InnerBalance acknowledged numerous categories of material that are deemed to constitute confidential information, including the Operations Manual and:

> procedures and processes of selling, marketing and promoting the services to customers; all other systems of operation, services, programs, products, procedures, policies, standards, techniques, specifications and criteria which now comprise or in the future may comprise a part of the Health Recovery treatment model . . . .

In that same section of the Franchise Agreement, InnerBalance agreed that:

> **upon** the expiration or other **termination of this Agreement**. . . , the **Franchisee shall return** to the company **all** such **confidential information** including all materials, books, records, software and manuals deemed to be confidential herein which are in the Franchisee's possession.

(Emphasis added.) Section 6.3(E) of the Franchise Agreement provides that the Operations Manual remains the property of Health Recovery Systems and that InnerBalance will return the Operations Manual upon the termination of the Franchise Agreement.

The Franchise Agreement has been terminated. Yet InnerBalance has not returned the Operations Manual or any of Plaintiffs' confidential information. C. Mathews Decl. ¶7. This violates the clear language of the Franchise Agreement.

Plaintiffs have established a likelihood of success on their claim for breach of these provisions of the Franchise Agreement.

### 2. InnerBalance Is Violating Its Obligation To Transfer Telephone Numbers, Telephone Listings And Directory Advertising

Under Section 17.1 of the Franchise Agreement, upon termination, InnerBalance was required to direct the transfer of all telephone numbers, telephone listings and directory advertising to Health Recovery Systems. The Franchise Agreement has been terminated. Yet InnerBalance has not transferred any telephone numbers, listings or

directory advertising to Health Recovery Systems. C. Mathews Decl. ¶10. This violates the clear language of the Franchise Agreement.

Plaintiffs have established a likelihood of success on their claim for breach of these provisions of the Franchise Agreement.

### 3. Inner Balance Is Violating Its Covenant Not To Compete

Section 18.2 of the Second Addendum to the Franchise Agreement, see Complaint, Exhibit C, provides that after termination InnerBalance:

> **may not** solicit, contact or do any work for any customer or potential customer developed as a HEALTH RECOVERY franchise. . . nor may [InnerBalance] **operate a business which incorporates bio-chemical restoration and repair**, except to the extent that [InnerBalance] can demonstrate the operation of a business which incorporates bio-chemical restoration and repair was being done by [InnerBalance] prior to this Franchise Agreement. . . . Notwithstanding any prior operation of a business. . . [InnerBalance] **may not use any materials, systems, formulas, processes or methods which were developed as a HEALTH RECOVERY franchisee**.

(Emphasis added.) InnerBalance acknowledged in the Second Addendum to the Franchise Agreement itself that "[t]he covenants not to compete contained in this Agreement are fair and reasonable, and will not impose any undue hardship on the Franchisee. . . ." Id. (Section 18.4). Despite termination, InnerBalance is operating a chemical dependency treatment program which incorporates bio-chemical restoration and repair. This violates the plain language of the Franchise Agreement.

The covenant not to compete is valid and enforceable. A covenant not to compete that "is for a just and honest purpose, for the protection of a legitimate interest of the party in whose favor it is imposed, reasonable as between the parties, and not injurious to the public," is generally upheld. Bennett v. Storz Broadcasting Co., 134 N.W.2d 892,

898 (Minn. 1965). Here, the covenant is for the just and honest purpose of protecting Plaintiffs' legitimate interests in their trade secrets, confidential information and the unique Health Recovery treatment model. The covenant is reasonable as between the parties, as InnerBalance itself acknowledged. InnerBalance may continue providing treatment services that do not involved bio-chemical restoration and repair. The covenant is not injurious to the public.[3]

Plaintiffs have established a likelihood of success on their claim for breach of the covenant not to compete.

### C. Plaintiffs Are Likely To Succeed On Their Claim For Misappropriation Of Trade Secrets

The Minnesota Uniform Trade Secrets Act defines trade secrets as:

> information, including a formula, . . . compilation, program, . . . method, technique or process, that:
>
> (i) derives independent economic value, actual or potential, from not being readily know to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Minn. Stat. 325C.01(5).

The information set forth in the Operations Manual, including processes, formulas and treatment protocols, are not generally known and cannot be readily ascertained through proper means. Mathews Larson Decl. ¶10. This information has economic value

---

[3] InnerBalance cannot avoid injunctive relief by claiming that the duration of the non-compete provision is unreasonable. Minnesota's "blue pencil doctrine" allows a court to place reasonable limits on a non-compete agreement. Ikon Office Solutions, Inc. v. Dale, 170 F. Supp.2d 892, 895, aff'd, 2001 WL 1269994 (8th Cir. 2001).

because it is not known or readily ascertainable. Id. Others with knowledge of this information could use it to operate treatment centers and obtain economic value. Id. The fact that InnerBalance entered into a Franchise Agreement in order operate a treatment center using the Health Recovery treatment model demonstrates the value of Plaintiffs' trade secrets.

Plaintiffs have taken reasonable efforts to maintain the secrecy of the Operations Manual. Plaintiffs restrict access to the Operations Manual. See C. Mathews Decl. ¶5. Employees with access to the Operations Manual are required to execute confidentiality agreements. Plaintiffs require that their franchisees protect the confidentiality of the Operations Manual. Plaintiffs' efforts to maintain the secrecy of the Operations Manual satisfy the requirements of the Minnesota Uniform Trade Secrets Act. Wyeth v. Natural Biologics, Inc., 395 F.3d 897, 899 (8th Cir. 2005).

InnerBalance has misappropriated Plaintiffs' trade secrets by retaining them after the termination of the Franchise Agreement. Moreover, it appears that InnerBalance is continuing to operate under the Health Recovery treatment model and is using Plaintiffs' trade secrets in the operation of their treatment centers. See Equus Computer Systems, Inc. v. Northern Computer Systems, Inc., 2001 WL 1636487, *3 (D. Minn. 2001) (issuing preliminary injunction where there was merely a "threat" that defendant would use purloined trade secrets in business).

Plaintiffs have established a likelihood of success on the merits of their trade secret claim.

## II. Plaintiffs Will Be Irreparably Harmed In The Absence Of A Preliminary Injunction

Plaintiffs will be irreparably harmed in the absence of a preliminary injunction. Irreparable harm can be shown where monetary damages do not provide an adequate remedy. Monetary damages are inadequate when the nature of the plaintiff's loss makes damages very difficult to calculate. See Roland Machinery Co. v. Dresser Indus., 749 F.2d 380, 386 (7th Cir. 1984); Jackson v. Nat'l Football League, 802 F. Supp. 226, 231 (D. Minn. 1992). Loss of customers, loss of goodwill, and threats to a business' viability constitute irreparable harm. See Zurn Constructors, Inc., v. B.F. Goodrich Company, 685 F. Supp. 1172, 1181 (D. Kan. 1988).

### A. Plaintiffs Will Be Irreparably Harmed By InnerBalance's Trademark Infringement And Unfair Competition

"Because a trademark represents intangible assets such as reputation and goodwill, the Court may presume irreparable harm" where there is a likelihood of confusion. Country Inn & Suites by Carlson, 2001 WL 1587903 at *2, n.1, citing General Mills, Inc. v. Kellogg Co., 824 F.2d 622, 625 (8th Cir. 1987). In addition, where, as here, a trademark licensor is suing a terminated licensee, "[t]he licensor's case for a preliminary injunction is always stronger than in the ordinary trademark infringement case and 'irreparable harm always flows from unlawful use and confusion.'" Country Inn & Suites, 2001 WL 1587903, *2, n.1, quoting McCarthy, Trademarks and Unfair Competition, § 25.31.

### B. Plaintiffs Will Be Irreparably Harmed By InnerBalance's Breach Of Contract

#### 1. InnerBalance's Failure To Return Confidential Information

The irreparable harm flowing from InnerBalance's failure to return Plaintiffs' Operations Manual and confidential information is the same as that flowing from InnerBalance's misappropriation of trade secrets, discussed below.

#### 2. InnerBalance's Violation Of Its Covenant Not To Compete

"Minnesota courts recognize that the breach of a valid non-competition agreement affirmatively raises an inference of irreparable harm." Hypred S.A. v. Pochard, 2004 WL 1386149, *4 (D. Minn. 2004), quoting Ikon Office Solutions, Inc. v. Dale, 170 F. Supp.2d 892, 898 (D. Minn. 2001). See also Metro Networks Communications, LP v. Zavodnick, 2003 WL 22959680, *7 (D. Minn. 2003) ("Irreparable harm may be inferred from the breach of a valid restrictive covenant."). Moreover, InnerBalance acknowledged in the Franchise Agreement that the violation of the covenant not to compete "would result in immediate and irreparable injury to the Company [Health Recovery Systems] for which no adequate remedy at law will be available." Complaint, Exhibit C (Second Addendum to Franchise Agreement, Section 18.4).

#### 3. InnerBalance's Failure To Transfer Telephone Numbers, Telephone Listings And Directory Advertising

Section 17.1(d) of the Franchise Agreement, requiring that all telephone numbers, telephone listings and directory advertising be transferred to Health Recovery Systems upon termination, is meant to avoid consumer confusion. InnerBalance spent years promoting itself as a Health Recovery franchisee and an authorized source of chemical dependency treatment using the Health Recovery treatment model. InnerBalance

promoted itself through television ads, educational video tapes featuring Joan Mathews Larson, and printed brochures and response packets prepared by Plaintiffs. These materials prominently featured telephone numbers at which InnerBalance could be reached. People exposed to or in possession of this advertising and promotional material (which InnerBalance broadcast and distributed even after termination) will call InnerBalance seeking to obtain what InnerBalance can no longer provide – authorized treatment under the Health Recovery treatment model. The irreparable harm from this sort of confusion is analogous to the irreparable harm resulting from trademark infringement and unfair competition, discussed above.

**C. Plaintiffs Will Be Irreparably Harmed By InnerBalance's Misappropriation Of Trade Secrets**

"The mere threat of misappropriation of trade secrets constitutes irreparable harm and warrants injunctive relief." Equus Computer, 2001 WL 1634334, *4. "Where injunctive relief is explicitly authorized by statute, . . . proper exercise of discretion usually requires issuance of an injunction if the prerequisites for the remedy have been demonstrated and the injunction would fulfill the legislative purpose." Wyeth v. Natural Biologics, Inc., 2003 WL 22282371, *25 (D. Minn. 2003), aff'd, 395 F.3d 897 (8th Cir. 2005) (internal citation and quotation omitted). "In cases such as this, involving threats to trade secrets and confidential information, courts readily presume irreparable injury from a showing that the protectible interest at stake is imperiled by a defendant's conduct." PepsiCo, Inc. v. Redmond, 1996 WL 3965, *29 (N.D. Ill. 1996) (citing cases).

Plaintiffs' trade secrets represent more than twenty years work in the field of chemical dependency treatment, and form the foundation of Plaintiffs' businesses.

Mathews Larson Decl. ¶14. If those trade secrets are inappropriately disclosed by InnerBalance Plaintiffs will be devastated. Id. The treatment model under which they operate would no longer be unique. Id. Moreover, InnerBalance is using Plaintiffs' trade secrets in competition with Plaintiffs, causing loss of business resulting in damage which is difficult to calculate. See Id. ¶16. A preliminary injunction is appropriate to avoid this irreparable harm. See Equus Computer, 2001 WL 1636487, *4 ("If the proprietary information at issue is used inappropriately, then Plaintiff[s] could lose valuable customers, both long-standing and potential, and contract opportunities. Given the nature of the . . . market, such harm would be irreparable."). "[J]ust as it is impossible to unring a bell, once disclosed, trade secrets and confidential information lose their secrecy forever, and since the confidentiality of this information can never be regained, the [threatened] injuries would indeed be irreparable." PepsiCo,1996 WL 3965 at *30 (internal citation and quotation omitted).

Plaintiffs have established that they will be irreparably harmed in the absence of a preliminary injunction.

## III. The Balance Of Hardships Tips In Favor Of Granting A Preliminary Injunction

The balance of hardships favors the grant of a preliminary injunction. Plaintiffs will be irreparably harmed in the absence of a preliminary injunction. InnerBalance, however, has already acknowledged that enforcement of the covenant not to compete

> will not impose any undue hardship on [InnerBalance], since [it] has other considerable skills, experience and education which affords the opportunity to earn income from such other endeavors.

Complaint, Exhibit A (Franchise Agreement, Section 2.10). By the same token, the other relief that Plaintiffs seek will not unduly burden InnerBalance either. InnerBalance will not be unduly burdened if it is forced to quit using Plaintiffs trademarks, return Plaintiffs trade secrets and confidential information and stop passing itself off as a Health Recovery franchisee, whether by use of advertising and promotional materials or the use of pre-termination phone numbers, phone listing or directory advertising.

**IV. The Public Interest Tips In Favor Of Granting A Preliminary Injunction**

The public interest favors the grant of a preliminary injunction. "[P]rotecting intellectual property and preventing consumer deception is in the public interest." Country Inns & Suites, 2001 WL 1587903, at *4. The public interest also "favors the protection of legitimate business interests and the discouragement of unfair competition." Equus Computer Systems, 2001 WL 163487, at *4. Enforcing contract rights and protecting trade secrets and confidential information are all in the public interest. The public interest is also served by enforcing valid restrictive covenants. Metro Networks, 2003 WL 22959680, at *7.

**V. No Bond Should Be Required To Secure An Injunction**

Pursuant to Section 19.4 of the Franchise Agreement InnerBalance has agreed that no bond is required to secure an injunction.

## CONCLUSION

For the reasons stated above, Plaintiffs' motion for a preliminary injunction should be granted.

Respectfully submitted,

Dated: May 4, 2005

DORSEY & WHITNEY LLP

By ______________________________
J. Thomas Vitt (No. 183817)
Sri K. Sankaran (No. 204304)
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600

Attorneys for Plaintiffs