UNITED STATES DISTRICT COURT
District of Minnesota

Health Recovery Center, Inc., a Minnesota corporation, and Health Recovery Systems, Inc., a Minnesota corporation,

Plaintiffs,

v.

InnerBalance LLC, a Colorado limited liability company, InnerBalance Health Center, LLC, a Colorado limited liability company, InnerBalance Health Systems, LLC, a Colorado limited liability company, Joseph W. Eisele, and Ron Graham,

Defendants.

Case Number: 05-CV-880 JMR/FLN

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

## I. INTRODUCTION.

Defendants InnerBalance LLC, InnerBalance Health Center, LLC, InnerBalance Health Systems, LLC, Joseph W. Eisele, and Ron Graham (referred to collectively herein as "InnerBalance") submit this Memorandum in Opposition to Motion for Preliminary Injunction filed by Plaintiffs Health Recovery Center, Inc. and Health Recovery Systems, Inc. (referred to jointly herein as "HRS".)

While there are portions of the Plaintiffs' request for preliminary injunctive relief which are based upon enforceable parts of the parties' earlier agreements, a significant part of the request is a cynical attempt to force Defendants out of business before the merits of this matter can be heard, to disrupt Defendants' preparation for the critical arbitration proceeding between the parties which is due to go to hearing in 10 days, and to make it impossible for Defendants to

prepare and present their side of the case in this proceeding as well as the arbitration, all while ignoring the plain language of the parties' agreements.

Defendants request that the Court deny the egregious portions of the preliminary injunction request, permit the reasonable portions to go into effect under the Court's supervision, and schedule a trial in this matter in an expeditious manner.

## II. FACTS

In August 2000, Defendant InnerBalance LLC entered into a Franchise Agreement with Plaintiff Health Recovery Systems. That Franchise Agreement was terminated by HRS in November 2004, under conditions that have lead to a commercial arbitration proceeding – now underway – between InnerBalance and HRS.

On May 4, 2005, HRS filed its Complaint in the above-captioned matter, and submitted its Motion for Preliminary Injunction. HRS has requested that the Court issue a preliminary injunction to bar InnerBalance from:

- using the HRS trademark or confusingly similar variations thereof;
- holding itself out as being affiliated with or a franchisee of HRD;
- using or copying promotional materials, brochures, educational materials, or advertising prepared by HRS;
- making any further use of HRS' Operations Manual or other confidential or trade secret information;
- operating a business which incorporates bio-chemical restoration and repair;
- soliciting, contacting, or doing any work for any customer or potential customer developed as a franchisee of HRS, and

- using any materials, systems, formulas, processes, or methods which were developed as a franchisee of HRS.

HRS also requested that the Court order InnerBalance to:

- return all copies of HRS' Operations Manual or other confidential or trade secret information, and materials based thereupon;
- transfer to HRS certain telephone numbers and listings; and
- return to HRS all materials using the HRS trademark or confusingly similar variants.

## III. ARGUMENT

### A. HRS MUST MEET THE LEGAL STANDARD APPLICABLE TO REQUESTS FOR INUNCTIVE RELIEF.

While the issuance of a temporary injunction is committed to the sound discretion of the trial court, the court abuses its discretion in awarding an injunction if it disregards the equitable principles which severely limit the circumstances under which this extraordinary remedy should be used. *First State Ins. Co. v. Minnesota Min. & Mf'g Co.*, 535 N.W.2d 684, 687 (Minn. Ct. App. 1995) (citing *Cramond v. AFL-CIO*, 126 N.W.2d 252, 257 (Minn. 1964)). A temporary injunction should be sparingly granted as it adjudicates the relative rights of the parties and restricts the restrained party's freedom to act without a complete trial on the merits. A temporary injunction is an "extraordinary" remedy that may be awarded only where the Court is thoroughly satisfied that the movant is likely to succeed on the merits and will be irreparably harmed before a trial on the merits can be held. *Miller v. Foley*, 317 N.W.2d 710, 712 (Minn. 1982); *Integrated Dev. and Mfg. Co. v. University of Minnesota*, 363 N.W.2d 845, 847 (Minn. Ct. App. 1985).

The Court must weigh five factors in deciding whether a temporary injunction is necessary to prevent irreparable injury: 1) the nature of the relationship between the parties before the dispute

giving rise to the request for relief; 2) the relative hardships between the parties, particularly comparing the harm to be suffered by the moving party if the temporary injunction is denied with that inflicted on the non-moving party if the injunction is granted; 3) the likelihood of success on the merits by the plaintiff; 4) the public interest in either granting or denying the injunction; and 5) the administrative burdens involved in enforcing the temporary injunction. *Dahlberg Bros., Inc. v. Ford Motor Co.*, 137 N.W.2d 314, 321-22 (Minn. 1965); *Specific Equip. and Irrigation, Inc. v. Toro, Inc.*, 519 N.W.2d 911, 914 (Minn. Ct. App. 1994); *Edin v. Josten's, Inc.*, 343 N.W.2d 691, 693 (Minn. Ct. App. 1984).

The movant must introduce specific proof on each of these factors and bears the burden of proving the entitlement to this extraordinary remedy on each and every point:

> Injunctive relief should be awarded only in clear cases, reasonably free from doubt, and when necessary to prevent great and irreparable damage. The burden of proof rests upon the complainant to establish the material allegations entitling him to relief. Injunctions ought not to be granted in any case except where it is clear that any legal remedy the party may have is inadequate. An injunction will not issue to prevent an imagined injury which there is no reasonable ground to fear. The threatened injury must be real and substantial.

*AMF Pinspotters, Inc. v. Harkens Bowling, Inc.*, 110 N.W.2d 348, 351 (Minn. 1961) (emphasis added) (citations omitted); *Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.*, 871 F.2d 734, 737 (8th Cir. 1989).

## B. <u>HRS CANNOT BAR INNERBALANCE FROM OPERATING AS IT DID PRIOR TO THE EXECUTION OF THE FRANCISE AGREEMENT.</u>

HRS' request that InnerBalance be barred from "operating a business which incorporates bio-chemical restoration and repair" cannot be sustained. HRS bases that request on Paragraph 13, Section 18.2 of the Second Addendum to the parties' Franchise Agreement, which clarifies what limitations are to be placed upon InnerBalance after termination of the Franchise Agreement:

> The Franchisee may not solicit, contact or do any work for any customer or potential customer developed as a HEALTH RECOVERY franchisee at any time nor may they operate a business which incorporates bio-chemical restoration or repair, **except to the extent that the Franchisee can demonstrate the operation of a business which incorporates bio-chemical restoration and repair was being done by the Franchisee prior to this Franchise Agreement** or which, at the time of disclosure by the Company to the Franchisee, has become part of the public domain… Notwithstanding any prior operation of a business which incorporates bio-chemical restoration and repair, the Franchisee may not use any materials, systems, formulas, or methods which were developed as a HEALTH RECOVERY franchisee.

Exhibit C to Complaint at 6 (emphasis added.)

The sole foundation for its claim that HRS is likely to succeed on the merits on its allegation that InnerBalance is violating amended Section 18.2 is that, "InnerBalance is operating a chemical dependency treatment program which incorporates bio-chemical restoration and repair. This violates the plain language of the Franchise Agreement." Memorandum at 15.

HRS is correct that InnerBalance is operating a chemical dependency treatment program which incorporates bio-chemical restoration and repair. HRS neatly fails to note the material limitation on the "plain language" of the Franchise Agreement: InnerBalance is fully able and permitted to continue to operate a chemical dependency treatment program which incorporates bio-chemical restoration and repair so long as it was operating a chemical dependency treatment program which incorporated bio-chemical restoration and repair as of August 2000. This alteration of the boilerplate non-compete clause in HRS' form Franchise Agreement was of significant importance to InnerBalance, and was specifically negotiated by InnerBalance and its owners, Ron Graham and Joe Eisele, through their attorney, David Herrera. Declaration of Joe Eisele ("Eisele Declaration"), attached as Exhibit A to Sandberg Affidavit, at ¶ 20.

The reason for InnerBalance's insistence on the amended Section 18.2 is simple: InnerBalance **was** operating a chemical dependency treatment program which incorporated bio-chemical restoration and repair **prior to August 2000**. The evidence of that business is

considerable. One of InnerBalance's owners, Joe Eisele, holds a National Alcohol and Drug Counselors Certification and is a Colorado Certified Alcohol Counselor, Level III. He has worked in the alcohol and drug rehabilitation field in Fort Collins and Denver, Colorado for the past 22 years. In the early to mid-1990's, Mr. Eisele became interested in biochemical restoration and repair to treat alcohol and drug addiction and began studying various books and other materials on the subject. Eisele Declaration at ¶¶ 5-6.

As early as 1992, Mr. Eisele was familiar with the benefits of nutritional supplements to prevent relapse of addiction patients. Such supplements were in use at Seven Lakes Recovery Center, the addiction center where he was employed from approximately 1984 to 1998. By 1996, Mr. Eisele requested and collaborated in obtaining a scholarly report in the area provided to him by two Master of Science degree candidates. Eisele Declaration at ¶¶ 7-8 and accompanying exhibits. InnerBalance's founders believe that alcohol destroys the vital nutrients (vitamins, minerals, and amino acids) that control mental function. The damage done by alcohol such as anxiety, depression, insomnia, impaired cognitive thinking, poor memory, tremors, headaches, shakiness, chronic fatigue, dizziness, and mood swings, may be undone by supplying nutrients in high dosages to correct the imbalances. Eisele Declaration at ¶ 4, Graham Declaration at 4. In the 1998-2000 timeframe, Mr. Eisele was highly interested in biochemical restoration and repair to treat alcohol and drug addiction and had been studying various books and other materials on the subject for some time. Declaration of Dr. Nola McDonald ("McDonald Declaration") at ¶ 9.

In 1998, Mr. Eisele formed InnerBalance with Ron Graham. For approximately two years prior to becoming a franchisee of HRS - from 1998 through 2000 - InnerBalance operated a biochemical restoration and repair-based rehabilitation clinic to treat drug and alcohol additions on and outpatient basis in Fort Collins, Colorado. InnerBalance's pre-franchise, 48-day, bio-chemical

restoration and repair based, rehabilitation program, as conducted from 1998 through 2000, included initial client intake conferences, initial doctor intake conferences, initial assessment and (if appropriate) detoxification of clients, laboratory testing of clients for nutritional deficiencies, nutritional therapy through supplements, intravenous nutrient therapy through drips and syringe pushes, traditional group therapy talking sessions, individual mental health counseling, individual biocounseling, and doctor follow-up. Eisele Declaration at ¶¶9-12 and associated exhibits; Declaration of Ron Graham ("Graham Declaration") attached as Exhibit B to Sandberg Affidavit, at ¶¶ 8-10. One of the founders of InnerBalance, Ron Graham, had referred to this approach as biochemical repair and restoration for years before the HRS franchise came into existence. He used a biochemical-based approach in overcoming his own addition, staring in 1993. Graham Declaration at ¶¶ 4-5. In the 1998-2000 timeframe, Mr. Graham was highly interested in and knowledgeable about all aspects of nutrition as a means to assist clients of InnerBalance in overcoming addictions. Declaration of Dr. Nola McDonald ("McDonald Declaration") attached as Exhibit C to Sandberg Affidavit, at ¶ 10.

There is extensive documentary evidence of the sort of biochemical restoration and repair-based rehabilitation being done by InnerBalance prior to August 2000. InnerBalance prepared a marketing brochure which was distributed to potential clients during the pre-franchise period. Eisele Declaration at ¶13 and associated exhibit; Graham Declaration at ¶12. That marketing brochure discussed the effectiveness of "biochemical repair" to treat addiction and stated, "Biochemical imbalances may underlie your addiction and be complicating your recovery" and, "If you are an individual who has previously been through conventional treatment or is currently in the recovery process, evaluation and treatment of chemical imbalances may be of great value to you in supporting your sobriety."

In its marketing between 1998 and 2000 - prior to starting as an HRC franchisee - InnerBalance used a letter which discussed "biochemical vulnerability" among addicts and described in detail the metabolic stabilization and screening process conducted by InnerBalance. Eisele Declaration at ¶ 15 and associated exhibit; Graham Declaration at ¶ 14.

From 1998 through 2000, Jacqueline Fields, M.D., worked with InnerBalance as one of its doctors. She performed tests on InnerBalance patients, and there are test results showing that InnerBalance was engaged in biochemical assessments at that time. Eisele Declaration at ¶16 and the associated exhibit of test results for an InnerBalance client dated June 11, 1998. InnerBalance was also performing amino acid tests on clients in 1999 and 2000. Eisele Declaration at ¶¶ 18-19 and the associated exhibits showing typical amino acid test results from two InnerBalance clients.

Knowledge of HRS' operations was not confined just to its patients and staff. In March 2000, the *Fort Collins Coloradoan* printed an article describing InnerBalance's biochemical-based rehabilitation program in place at that time, and describing InnerBalance's use of nutritional supplements and limiting the intake of sugars and caffeine by its clients. Eisele Declaration at ¶17 and associated exhibit of the newspaper article; Graham Declaration at ¶ 15.

Other documents demonstrate InnerBalance's use of vitamins, minerals, and amino acids in its treatment programs, and the sorts of test, assessments, and treatment plan aspects, including thyroid testing, blood sugar testing, vitamins and minerals testing, and amino acids testing, being used by InnerBalance prior to the Franchise Agreement. InnerBalance's 16 week program included various services, including "Education Group - Nutrition;" "Vitamins, minerals and amino acids;" and "Blood work up". Eisele Declaration at ¶¶ 18-19 and associated exhibits; Graham Declaration at ¶ 16.

Between 1998 and 2000, Dr. Nola McDonald (a Board Certified Family Practice Physician) worked with Mr. Eisele and Ron Graham in connection with InnerBalance; as a result, she is familiar with the operations of InnerBalance from 1998 through 2000. McDonald Declaration at ¶¶ 1-4. From 1998 through 2000, Dr. McDonald met with numerous InnerBalance clients and performed comprehensive laboratory testing for numerous clients of InnerBalance, including plasma tests, urine tests, testing of amino acids levels, full blood chemistry work, testing of vitamin B12 levels, testing of folic acid levels, evaluating histamines, and testing hormone profiles. McDonald Declaration at ¶ 7.

Based upon her personal knowledge, Dr. McDonald agrees that InnerBalance and its owners (Messrs. Graham and Eisele) were engaged in a biochemical approach to treating drug and alcohol addictions prior to 2000, which included evaluating nutritional causes of addiction diseases and improving every aspect of their clients' nutrition and diet, along with talk therapy and other traditional counseling methods. Between 1998 through 2000, Ron Graham, Joe Eisele, and InnerBalance recommended and provided nutritional supplements, vitamins, minerals, and amino acids such as GABA (gamma-aminobutyric acid) to their rehabilitation clients. Dr. McDonald was personally involved in administering intravenous drips and syringe pushes of vitamins and minerals to InnerBalance clients when appropriate. McDonald Declaration at ¶¶ 5-6.

Between 1998 through 2000, InnerBalance provided counseling to its addiction clients concerning every aspect of a healthful lifestyle, with an emphasis on proper diet and nutrition, including limiting intakes of sugars, caffeine, and, obviously, any addictive substances, and increasing intakes of beneficial nutrients, vitamins, minerals, and amino acids. InnerBalance's 48-day, bio-chemical restoration and repair based, rehabilitation program – as conducted from 1998 through 2000 - included, among other things, initial client intake conferences, initial doctor intake

conferences, initial assessment and (if appropriate) detoxification of clients, laboratory testing of clients for nutritional deficiencies, nutritional therapy through supplements, intravenous nutrient therapy through drips and syringe pushes, traditional group therapy talking sessions, individual mental health counseling, individual biocounseling, and doctor follow-up. McDonald Declaration at ¶¶ 8, 11.

The nature of InnerBalance's treatment methods and processes in 1999 included recommending and providing nutritional supplements, vitamins, minerals, and amino acids to its clients, as well as comprehensive laboratory testing for various nutritional deficiencies. InnerBalance also provided counseling to its clients concerning every aspect of a healthful lifestyle, with an emphasis on proper diet and nutrition, including limiting intakes of sugars, caffeine, and, obviously, any addictive substances, and increasing intakes of beneficial nutrients, vitamins, minerals, and amino acids. Declaration of Martha Albrecht ("Albrecht Declaration") attached as Exhibit D to Sandberg Affidavit, at ¶¶ 3-6. The principals of InnerBalance, Joe Eisele and Ron Graham, were passionate about biochemical restoration and repair to treat alcohol and drug addiction and knowledgeable about the subject. Albrecht Declaration at ¶ 7.

InnerBalance's 48-day (approximately three days a week for 16 weeks) bio-chemical restoration and repair based, rehabilitation program conducted in the fall of 1999 included, among other things, an initial client intake conference, an initial doctor intake conference, an initial assessment, review of clients' pre-existing laboratory tests for nutritional deficiencies, nutritional therapy through supplements, multiple traditional group therapy talking sessions, individual counseling sessions, individual biocounseling, and doctor follow-up sessions. Albrecht Declaration at ¶ 8

There is clear and unrefuted evidence that InnerBalance's addiction rehabilitation – both prior to and during the period of the Franchise Agreement – has utilized a biochemical approach to treating drug and alcohol addictions, which includes evaluating nutritional causes of addiction diseases and improving every aspect of InnerBalance's clients' nutrition, diet, and exercise, along with talk therapy and other traditional counseling methods. Major aspects of InnerBalance's approach included addressing the substances that must be kept out of the alcoholic's body (including alcohol and other drugs, such as nicotine, caffeine, and refined sugars, and addressing the substances that must be restored (brain and body chemicals depleted by alcohol).

Simply put, similar activities in treating drug and alcohol addiction were conducted before InnerBalance became an HRS franchisee, were conducted during the time that InnerBalance was a franchisee of HRS, and continue to be conducted now that the franchise relationship has ended. Eisele Declaration at ¶11.

There is no basis in the present record on which HRS could prevail on its claim that InnerBalance cannot continue to operate its bio-chemical restoration and repair based rehabilitation program, and its request for an injunction barring InnerBalance from doing so cannot be sustained when the *Dahlberg* factors are applied.

The first *Dahlberg* factor, the previous relationship between the movant and the party to be restrained, is of no help to Plaintiffs, because the parties are business competitors who have independently developed their similar businesses. Prior to the execution of the Franchise Agreement, Defendants were operating a bio-chemical restoration and repair based rehabilitation program that was strikingly similar to the franchised bio-chemical restoration and repair based rehabilitation program of Plaintiffs, and Defendants are entitled to continue to operate a bio-chemical based program in the manner they did pre-Franchise.

The second factor is more significant, and requires a finding that more harm will result from denying the injunction than from issuing it. *Town of Burnsville v. City of Bloomington, 264 Minn. 133, 117 N.W.2d 746, 750 (1962)*. To prevail, HRS must show that irreparable harm will occur absent the injunction, such that "any legal remedy the party may have is inadequate," and that money damages could not adequately compensate the movant for its loss or damage. *AMF Pinspotters*, 110 N.W.2d at 351. The failure to show irreparable harm, by itself, dictates that no temporary injunction should issue. *Morse v. City of Waterville*, 458 N.W.2d 728, 729 (Minn. Ct. App. 1990).

Plaintiffs have advanced no proof that, if Defendants are permitted to continue to do in Colorado what they have done since at least 1998, Plaintiffs' treatment operations in Minnesota or their [to-date unsuccessful] franchising business[1] will be harmed in a way that money damages could not repair. Plaintiffs have been quite prepared to compute damages from Defendant's alleged contract breaches in the parties' arbitration. *See*, Respondent's Statement of Damage Claims, Exhibit F to Sandberg Affidavit.[2] There, Plaintiffs computed the harm they allege is present for the period after termination, based upon their projections of Defendants' ongoing business operations as an HRS franchisee. Defendants assert that money damages would be entirely adequate to compensate Plaintiffs for any alleged harm, and the extraordinary relief of a preliminary injunction is not warranted.

---

[1] To the best of Defendants' knowledge, Plaintiffs have only ever had **<u>one</u>** franchisee other than Defendants, and that franchisee is no longer in operation.

[2] Defendants do not vouch for nor accept the accuracy or veracity of the damages calculation noted on this Exhibit, but present it here to demonstrate that Plaintiffs clearly believe the harm that they would suffer if Defendants were able to continue in operations.

If Plaintiffs are granted their injunction barring Defendants from operating their bio-chemical restoration and repair based rehabilitation program, there will be no business left for Defendants to run, and thus the complete destruction of Defendants' long-standing bio-chemical restoration and repair based rehabilitation business. The owners of InnerBalance would be deprived of earning a living and would have to start their career over in another line of work, losing the benefit of their reputations built up years of work in the field of alcohol and drug rehabilitation. It is doubtful that they could even reestablish themselves in the field of alcohol and drug rehabilitation. The extreme stress and financial hardship on them and their families is plain. Eisele Declaration at 28; Graham Declaration at ¶ 25. At the same time, there would be no harm to Plaintiffs from permitting InnerBalance to continue in operation, since there is no evidence that Plaintiffs intend to open a clinic or grant a franchise anywhere in Colorado in the foreseeable future.

All that Defendants need show to defeat the request for preliminary injunction is that the harm to them will be substantial. *Pacific Equipment & Irrigation, Inc. v. Toto Co.*, 519 N.W.2d 911 (Minn.Ct.App. 1994.) The destruction of Plaintiffs' operating business and their personal livelihoods is more than substantial, and completely outweighs any speculative harm to Plaintiffs.

Third, Plaintiffs must demonstrate by material evidence that they will likely succeed on the merits of their case. *S&M Constructors, Inc. v. Foley*, 959 F.2d 97, 98 (8th Cir. 1992). HRS must show, in this instance, that InnerBalance will not be able to show that it was engaged in the business of bio-chemical restoration and repair based rehabilitation prior to August 2000. As detailed above, InnerBalance has clear and convincing proof that it was in fact engaged in exactly that business prior to the Franchise Agreement, and the likelihood of HRS prevailing on this point is virtually nil.

The fourth factor is the public interest, if any, in restraining Defendants' conduct prior to trial. Here the public interest favors allowing the effective treatment of drug and alcohol addiction

which Defendants have pioneered in Colorado since 1998 to continue to be available to patients who want and need those services. . InnerBalance currently has patients in its 35-day program that came to InnerBalance seeking help in overcoming their addictions due to the reputations of InnerBalance, Mr. Eisele and Mr. Graham, and also because of their biochemical approach to treatment. Preventing InnerBalance from utilizing its preferred approach to treatment would severely disrupt the patients in the current program and could cause them to relapse or have to start their rehabilitation process over elsewhere, possibly costing them hundreds or thousands of dollars and unforeseeable medical or social problems. Additionally, prospective clients would no longer have a biochemical treatment approach available to them in the Colorado region.

In addition, Defendants work with independent, licensed medical doctors in the operation of their business. Those doctors are required to exercise their professional medical judgment when working with patients. To the extent that those doctors believe in their sound medical expertise that certain nutritional supplements should prescribed for patients, an injunction barring the prescription of those supplements just because HRS also happens to believe the supplements are efficacious would amount to an interference with the doctors' practice of medicine. Such an interference would be contrary to the public interest.

Fifth, the issue of the administrative burden involved in enforcing the injunction does not favor either party on this issue.

Given the failure of Plaintiffs to satisfy the four substantive *Dahlberg* factors, the Court should deny Plaintiff's requested extraordinary remedy as to Defendants' business operations, and no temporary injunction should issue on this issue. [3]

---

[3] There is also the issue of an injunction bond, which is required under Rule 65.(c) of the Federal Rules of Civil Procedure. While the Franchise Agreement purports to limit such a bond

### C. <u>PLAINTIFFS HAVE FAILED TO SUPPORT THEIR REQUEST FOR A PRELIMINARY INJUNCTION BARRING DEFENDANTS FROM SOLICITING, CONTACTING, OR DOING ANY WORK FOR ANY CERATIN CUSTOMERS OR POTENTIAL CUSTOMERS.</u>

While Plaintiffs included in the prayer for relief in the Complaint a request for a Preliminary Injunction barring Defendants from contacting, soliciting, or doing any work for any customer or potential customer developed as an HRS franchisee (*see*, Complaint at 19), Plaintiffs have failed to provide any basis or support for that request in their Motion. HRS has the burden of showing that the *Dahlberg* factors weigh in its favor on each element of the requested preliminary injunction, and has utterly failed to so on this point.

The evidence supporting the existence of a business that incorporated bio-chemical restoration and repair as of August 2000 is thoroughly set out in the preceding section. Because of that pre-existing business, Section 18.2 as amended by the parties permits Defendants to continue working with customers who may have initially come to InnerBalance during the period of franchising, and no injunction restricting or barring such work should issue.

---

to $100, that limitation is patently unreasonable in this case. Relying solely on **<u>Plantiffs'</u>** calculation of what InnerBalance's revenues would be post-franchise, assuming a 15% profit margin and two years until trial, doubled to account for loss of goodwill by being out of the business for two years, a reasonable bond amount would be $426,811.80. The trial court has wide discretion in setting the amount of the bond. *Petition of Giblin*, 232 N.W.2d 214, 223 (Minn. 1975), and the bond is intended to protect the part whose actions are restrained against loss sustained by reason of the injunction. *Paradata of Minnesota, Inc. v. Fox*, 356 N.W.2d 852, 855 (Minn.Ct.App. 1985.) Setting a $100 bond where the potential damages are three orders of magnitude greater does not meet the rule's purpose of protecting Defendants. Parties are not free to alter the Rules of Civil Procedure by agreement. If they were, parties could contract away their obligations to personally serve, to testify under oath, to properly plead claims, or to meet other requirements for injunctive relief. While Defendants do not believe an injunction limiting InnerBalance's business operations should issue, if the Court determines to do so, a bond in the amount of $500,000 should be required under the direction of Rule 65(c).

D. **<u>DEFENDANTS NEED ACCESS TO PLAINTIFFS' OPERATIONAL, PROMOTIONAL, EDUCATIONAL, AND ADVERTISING MATERIALS FOR THE DURATION OF THE TWO PENDING LEGAL ACTIONS.</u>**

Plaintiffs have requested that Defendants be required to immediately return all return all copies of HRS' Operations Manual, other allegedly confidential or trade secret information, and all materials using the HRS trademark or confusingly similar variants. While Defendants do not agree at this juncture that the materials identified necessarily qualify as confidential or trade secret information, they also have no long-term need for these materials. However, there is a pressing need for these materials which is sufficient to defeat the requested injunctive relief.

There are presently two legal proceedings underway based upon the franchise relationship which was in place between InnerBalance and HRS from August 2000 to November 2004: an arbitration initiated by InnerBalance on July 13, 2004 before the American Arbitration Association based upon the improper actions of HRS in that termination, and this action by HRS. The arbitration is presently scheduled for a six-day hearing before Arbitrator Edward C. Stringer on Monday, May 23, 2005, although that date may be moved as a result of the Plaintiffs' Motion in this matter. The trial in this case is not likely to take place until late in 2006. There is also another matter pending in Federal District Court in Colorado concerning John Mathews Larson's deceptive use of titles "Dr." and "Ph.D." in Colorado.

The materials which Plaintiffs have demanded be returned by InnerBalance – including HRS' Operations Manual, training video and audio tapes, lectures, group therapy session outlines and handouts, group videos, individual therapy session outlines and handouts, group and individual bio-chemical session outlines and handouts, medical and lab procedure forms and handouts, materials, documents, or notes based upon or reflecting information contained in HRS' Operations Manual, and material displaying any Health Recovery Center, Inc. trademark including brochures,

advertising materials, video tapes, and audio tapes - may well be used as evidence in the AAA arbitration or in this matter. Eisele Declaration at ¶ 24.

Other than as evidence, InnerBalance has no interest in those materials, and has no objection to an order which requires InnerBalance to return all information of HRS ultimately determined to be proprietary, including the materials listed above, within 30 days of the final conclusion of the AAA arbitration and the instant litigation (including any appeals), whichever is later.

The second *Dahlberg* factor should control here, because of the overwhelming harm that would result from granting the requested injunction requiring the immediate return of these materials. Without the materials, Defendants will be unable to effectively make the case in the arbitration hearing, where the issues of proper franchisor guidance, direction, and support are in play. In addition, in this case Plaintiffs have raised issues regarding whether Defendants have improperly used Defendants' allegedly proprietary materials, and Defendants will need ongoing access to those materials for the defense of this case.

Any potential harm to Plaintiffs from the temporary retention of these materials can be avoided by a limited injunction requiring Defendants to only use the materials for purposes of the two proceedings. If there are more specific concerns about what individuals may have access to certain materials or how those materials should be handled in each proceeding, the presiding officer in each proceeding can issue appropriate protective orders to spell out the terms of use.

The Court should issue an order permitting Defendants to use these materials only for the purposes of the two pending proceedings, subject to any protective order(s) that may be issued in those proceedings.

## E. <u>THERE ARE NO PROPRIETARY MATERIALS, SYSTEMS, FORMULAS, PROCESSES OR METHODS OF HRS IN USE BY INNERBALANCE.</u>

Plaintiffs have requested an injunction barring Defendants from using any materials, systems, formulas, processes, or methods which were developed as a franchisee of HRS. The grounds for this request are these are trade secrets. Memorandum at 16. Defendants' request founders on the third *Dahlberg* factor because Plaintiffs cannot demonstrate by material evidence that they will likely succeed on the merits of proving that there are trade secret materials in use by InnerBalance today. *See, S&M Constructors, Inc. v. Foley*, 959 F.2d 97, 98 (8th Cir. 1992).

First, InnerBalance is unaware of any materials, systems, formulas, processes, or methods which were developed as a franchisee of HRS. As outlined in the Declarations of Messrs. Eisele and Graham, InnerBalance had fully developed materials, systems, formulas, processes, or methods in place and in active use prior to becoming a franchisee of HRS. To the extent that these materials, systems, formulas, processes, or methods predate franchising, InnerBalance's use cannot be cut off now by HRS. It is Plaintiffs' burden to identify exactly which materials, systems, formulas, processes, or methods were developed by InnerBalance while a franchisee of HRS and were not in place at InnerBalance prior to the Franchise Agreement. HRS has not even attempted to make such an identification, but has merely made a blanket assertion that "all the information set forth in the Operations Manual … are [sic] not generally known and cannot be readily ascertained by proper means." Memorandum at 16.

Such a sweeping statement is not a substitute for material evidence, and InnerBalance submits that is no such material evidence. To the contrary, there is evidence that InnerBalance does not use materials or formulas from HRS. For example, InnerBalance does not currently utilize or recommend **<u>any</u>** nutritional supplement formulas which were created by Bio-Recovery,

Inc., HRS, Health Recovery Center, Inc., or their affiliated entities or agents. Eisele Declaration at ¶ 25. Further, the nutritional supplements InnerBalance has provided to its clients from 1998 through 2000 and in 2005 are commercially available from multiple sources not affiliated with HRS. Eisele Declaration at ¶ 25. Moreover, because InnerBalance works with licensed medical doctors, many of the nutritional supplements are recommended, prescribed and administered directly by those doctors over whom InnerBalance does not and should not exercise any control.

Second, it is not at all clear that any of the materials, systems, formulas, processes, or methods in use by InnerBalance – even if shown to have come from HRS - could qualify as a trade secret. Joan Mathews Larson, owner of HRS, has published purportedly "best-selling" books available on amazon.com and other sources entitled *Seven Weeks to Sobriety; Depression-Free, Naturally: 7 Weeks to Eliminating Anxiety, Despair, Fatigue, and Anger from Your Life;* and *Alcoholism the Biochemical Connection: A Breakthrough Seven-Week Self-Treatment Program.* These books describe the premise of her philosophy concerning the use of nutritional supplements to treat alcohol and drug addiction. Eisele Declaration at ¶ 26. To the extent that Ms. Larson has expounded on her recommended use of nutritional supplements to treat addiction, the HRS systems, formulas, processes, or methods which are based upon those recommendations have been put into the public view and cannot now be asserted to be protectable trade secrets.

In addition, there is generally available scientific work on the benefits of vitamins, minerals, essential oils, amino acids, and proper diet in the treatment of addition. Eisele Declaration at ¶ 27 and associated exhibit of Dr. Mark Occhipinti. The biochemical concept of treating additions is in the public domain, and cannot be sequestered by Plaintiffs under a claim of trade secret.

There is considerable doubt that Plaintiffs will ever prevail on their claim that InnerBalance is using HRS' trade secrets today. Since Plaintiffs have not produced material evidence that they will likely succeed on that claim, the Court cannot grant a preliminary injunction on this point.

## F. DEFENDANTS DO NOT OPPOSE A PRELIMINARY INJUNCTION LIMITED TO BARRING DEFENDANTS FROM USING THE HRS TRADEMARK OR CONFUSINGLY SIMILAR VARIATIONS THEREOF, AND FROM HOLDING THEMSELVES OUT AS BEING AFFILIATED WITH OR A FRANCHISEE OF HRS.

While InnerBalance does not agree with or accept the various factual allegations made by HRS regarding InnerBalance's supposed improper use of HRS' trademarks or its "holding out" of some relationship with HRS, a resolution of those factual matters will require discovery[4] and a determination after trial. Without waiving in any way its right to contest any and all of those factual allegations, InnerBalance does not object to the entry of a preliminary injunction (to be effective until a final decision on the merits) limited to barring InnerBalance from using the HRS trademark or confusingly similar variations of that mark. Similarly, InnerBalance does not object to the entry of a preliminary injunction (to be effective until a final decision on the merits of the Complaint) barring InnerBalance from holding itself out as a franchisee of HRS or as being otherwise affiliated with HRS.

All current operations of InnerBalance are conducted under the name InnerBalance Health Systems, LLC or InnerBalance Health Center, LLC, which are the names of Defendants' business entities registered with the Colorado Secretary of State. Eisele Declaration at ¶ 24. These business names are not confusingly similar to the trademark at issue here, "Health Recovery Center, Inc."

[4] Including, *inter alia*, such issues as the propriety of a paralegal employed by Plaintiffs' counsel directly contacting a represented party and making false statements to that party. *See*, Declaration of Shirley Bingham, accompanying Plaintiff's motion papers.

The US Patent and Trademark Office's database of registered trademarks lists 443 different trademarks that have included both the words "health" and "center", which are the only terms in common between HRS' trademark and the business names in use by Defendants. *See,* Exhibit E to Sandberg Affidavit.

Plaintiffs have not alleged that the two business names in use by Defendants infringe in any way on the HRS trademark. Given the highly diluted nature of any trademark using the terms "health" and "center" when there are 206 live trademarks[5] all using those two words as part of the mark, it seems unlikely that HRS could make such a claim in good faith. Plaintiffs bear the burden of showing that the two business names create a likelihood of confusion, and have completely failed to do so. An injunction barring Defendants from using the InnerBalance Health Systems or InnerBalance Health Center names would be groundless, and should not even be entertained by the Court.

The use of the InnerBalance Health Systems or InnerBalance Health Center names also does not connote any affiliation with or franchise relationship to HRS. The Franchise Agreement between the parties only related to rights to use "the name 'Health Recovery Center, Inc.' and other trademarks...now or hereafter used in connection with [HRS'] System." Section 1.4 of the Franchise Agreement, Exhibit A to Complaint. The two names under which Defendants are presently operating are outside the scope of the Franchise Agreement, and do not give rise any reasonable apprehension that Defendants are part of HRS' "System".

[5] Based upon a count of the "live" trademarks on the USPTO search report.

## G. DEFENDANTS DO NOT OPPOSE A PRELIMINARY INJUNCTION REQUIRING DEFENDANTS TURN OVER TO HRS THE PHONE NUMBERS WHICH WERE ACTUALLY USED IN CONNECTION WITH THE FRANCHISED BUSINESS.

Plaintiffs have requested an order directing that Defendants turn over "all telephone numbers, telephone listings and directory advertising" to HRS. Memorandum at 19. Plaintiffs assert those telephone numbers include 970-416-0616, 866-244-8866, 720-941-0442, and 866-557-7848. Declaration of Cynthia Mathews at ¶8. Plaintiffs have provided no basis for the selection of those telephone numbers.

While reserving all its rights to contest the factual allegations of the Complaint at the proper time, InnerBalance does not now object to an preliminary injunction which directs that the telephone numbers 970-416-0616, 866-244-8866, 720-941-0442, and 866-557-7848 be returned to HRS (along with the associated directory listings), since those numbers were used while InnerBalance was a franchisee of HRS. Some reasonable period of time to accomplish that return will be required in order to work with telephone service providers and directory operators; Defendants suggest 30 days to completely accomplish the transfer.

Regarding 970-495-4688, Mr. Eisele obtained that number at least 10 years before InnerBalance agreed to become a franchisee of HRS. He does not recall ever using that number to promote the franchise operations. Eisele Declaration at ¶ 23. In the absence of proof by Plaintiffs that 970-495-4688 was actively used in connection with the InnerBalance HRS franchise operations, there are no grounds to transfer that number to Plaintiffs, and Defendants should not be ordered to do so.

## IV. CONCLUSION

Plaintiffs have failed to meet their *Dahlberg* burden on as to their requested injunction limiting Defendants' operation of their business. Defendants have provided a proposed Order for the Court which contains the limited, preliminary injunctive relief to which Plaintiffs are entitled.

Dated: May 13, 2005

s/Christopher K. Sandberg
Christopher K. Sandberg
Bar Number 95485
Attorney for Defendants
Lockridge Grindal Nauen P.L.L.P.
100 Washington Ave. South
Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Fax: (612) 339-0981